614 So.2d 926 (1992)
Cecil GREEN
v.
STATE of Mississippi.
No. 90-KA-0961.
Supreme Court of Mississippi.
December 31, 1992.
Dissenting Opinion February 4, 1993.
Rehearing Denied March 25, 1993.
*927 James K. Dukes, Hattiesburg, for appellant.
Michael C. Moore, Atty. Gen., Deirdre McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
Dissenting Opinion of Chief Justice Hawkins February 4, 1993.
EDWIN LLOYD PITTMAN, Justice, for the Court:
Cecil Green was charged with capital murder for the November 1, 1988, gunshot death of Ralph Dean, a Mize, Mississippi police officer. A trial held in April 1989 ended in mistrial after the jury was unable to reach a verdict. After a second trial in July 1990 the jury returned a verdict of guilty of murder less than capital. Green has appealed to this Court alleging that:
(1) The lower court should have granted a peremptory instruction, j.n.o.v., or new trial as to Green's guilt because Green was the only eye-witness and his testimony established that the homicide was justifiable and/or excusable and because his testimony was not materially contradicted by other evidence or by the physical facts surrounding the alleged offense (i.e. The Weathersby Rule should have been applied.);
(2) The lower court violated Miss.R.Evid. 404 and 405(b) by denying Green the opportunity to submit evidence of character traits and specific acts of Dean which were relevant to Green's claim of self-defense;
(3) The lower court should not have allowed the jury to view the police vehicle of Dean; and
(4) The lower court should not have allowed the State to try Green on the charge of capital murder since Dean was not a law enforcement officer and was not acting within the scope of his duties.
Finding the lower court misapplied Rules 404 and 405(b) of the Miss.R.Evid., we reverse the judgment below and remand this case for a new trial. We note that the lower court did not err by allowing an inspection of the police vehicle and that the lower court did not err by finding Dean a police officer at the time of his death.

I.
In the early morning hours of November 1, 1988, Cecil Green, a 55-year-old native of Smith County, Mississippi, shot to death Ralph Dean, employed as a policeman by the town of Mize, Mississippi. The incident took place near Dean's patrol car parked beside a service station/convenience store at the intersection of Highways 28 and 35. Gunfire was exchanged between the two men, after which Green left the scene. Law enforcement personnel arriving at the scene found Dean's body face down in the parking lot with his personal pistol, not his official weapon, lying near his right hand. Green turned himself in on November 2, claiming self-defense. There were no eye-witnesses to the incident.
*928 Mize cosmetologist and Fire Department volunteer Phyliss Horn received 911 calls via a phone in her home while working as a Fire Department volunteer. Horn answered a call on November 1, 1988, around 2:45 a.m. The male caller said he needed the sheriff because he had killed somebody. The caller continued, "Just get me the sheriff, and I'll be down here," referring to the downtown area. Horn thought she recognized the voice and asked the caller if it was Mike Harvey. The caller answered yes. Horn called the sheriff in Raleigh and told him about the incident.
Mize Chief of Police Billy Joe Clark and Dean were the only members of the Mize police force. Clark went off duty around 10:00 p.m. on October 31. Dean had been on duty since 6:00 p.m. and was scheduled to continue working until 6:00 a.m. the next morning, November 1. Clark, who lived about 2/5 of a mile from the Shell Station, was lying in bed around 2:40 a.m. that night and heard around eleven to twelve shots. The shots ceased. He then heard four or five slow shots. Clark looked out his back door and didn't see anything. He went back to bed. About five minutes later, the scanner aroused Clark. Clark called the police office and didn't get an answer. Clark called the Smith County Sheriff's Department. He asked them what was going on. Clark then went to the Police Department in downtown Mize. He spotted the police car, with a line of shots through the front windshield, at the Shell Station. There were about four or five holes shot out of the car's back windshield. Dean was on the ground by the back wheel of the police car. Clark got in the police car to call the Sheriff's Department, and saw holes in the front seat and "something ... on the front seat, looked like flesh." The driver's window was shot out. Clark examined Dean, who appeared dead. Blood and glass were on the ground. From the position of the glass, Clark concluded that the driver's window glass had been shot out while the door was open. The patrol car was still running, and the driver's door was open. Dean's revolver was on the ground about two feet from Dean's right side. The gun was Dean's his personal pistol. Clark testified that the rapid eleven or twelve shots he heard first sounded like a high-powered rifle, not a pistol or shotgun.
When Smith County Sheriff Keith Bounds arrived at the scene of the shooting, about fifteen or twenty people were already there, including policemen from surrounding communities and some of the Smith County deputies. Bounds had been contacted by the radio operator at the Smith County Sheriff's Office. When Bounds arrived, the body was still on the ground. Bounds examined Dean's pistol, which was a fully loaded .38 Rossi revolver with six cartridges. Four had been fired.
Smith County Deputy Rodney Smith was called to the scene of the shooting. Upon arriving at 3:15 a.m., Smith noted that there was blood on the ground right outside of the driver's door with blood spots leading to where the body lay. The metal strip at the edge of the doorway "where you would clean your feet off" had blood and glass on it. The steering wheel had a hole in it. The dashboard was split, and the driver's seat had holes in it. Blood was present in the police car "on the ... driver's seat" on "the back part." About twelve to fifteen empty hulls also lay on the ground.
Paramedic Chuck Carter was called to the crime scene. Carter found the body in a knee-chest position with his knees and legs under him face down. There was no pulse. Carter observed that the major damage was in the head. The "skull appeared to be not intact completely."
Julia James of the Mississippi Crime Lab arrived at the barricaded scene at 6:15 a.m. James said that the six holes in the back windshield appeared to "be on a straight course from the front windshield to the back windshield." There were eleven holes in the front windshield.
Dr. Steven Hayne performed the autopsy of Dean. Dr. Hayne found nine gunshot wounds. There was an entrance gunshot wound on the left side of the nose. The brain "had essentially been blown out of the skull." The bullet had travelled upward *929 and exited the top part of the head. Dr. Hayne did not have the complete skull. There had also been a hemorrhage into the left lung. There were gunshot wounds to the lung. Two bullets had struck the heart. The "heart was literally ripped apart." The right kidney was hit and shredded.
Dr. Hayne said the head wound was probably the last wound because it would have been instantaneously lethal. Other wounds were lethal, but Dean would have had a few seconds of mobility. Dean had a gunshot wound to his right hand rendering the hand incapable of use. Dr. Hayne admitted that a human being can sometimes "go above and beyond what it ordinarily could or would do."
Some of the wounds indicated downward movement of a bullet; some indicated upward movement; some indicated movement to the left; some indicated movement to the right. Dean was moving somewhat when shot, probably in recoil.
Firearms expert Steven Byrd said that sixteen cartridge cases were fired from Green's gun. Four cartridges had been fired from Dean's six-round Rossi revolver. Fragments fired from Dean's revolver were found at the scene.
Joseph E. Andrews, Jr., an expert from the Mississippi Crime Lab in the area of microanalysis, said that fragments of the police car dashboard were found in Dean's body.
On November 2, 1988, about 12:30 p.m., Green called Bounds and asked Bounds to come to his trailer. Bounds had no information connecting Green to Dean's death at that time. Bounds and Deputy Mack Adcox went to see Green. When Bounds arrived with a deputy, Green was sitting on the trailer front doorsteps waiting. Green told Bounds, "I'm the man you're looking for in the Ralph Dean killing." Green also told Bounds that he killed Dean in self-defense and "had to do it." Bounds read Green his rights and told Green that he was going to get a search warrant in order to find the weapon. Green gave Bounds the rifle rather than waiting for a search warrant. The gun was on a couch inside the trailer, unloaded with the clip beside it. The weapon found at Green's home was a .223 semi-automatic known as a Mini .14. Green told Bounds he wanted an attorney.
At the jail in Raleigh, Smith County Deputy Sheriff Craig Gunter helped in the booking process. Both Gunter and Green testified about a conversation they had during the booking process. Gunter told Green, "Cecil, can I talk to you off the record? Well, Cecil, I'm so shocked. I don't understand it." Green told Gunter that Dean had tried to kill him. Green told Gunter, "Now, Craig, can I talk to you off the record?" Gunter said yes. Green replied, "Have you at any time ever heard anybody saying anything about me and Ms. Ruth Ann [Dean] having an affair or seeing each other, a relationship?" Gunter responded, "No, Cecil, I hadn't, but I know how jealous Mr. Ralph [Dean] is of Ms. Ruth Ann [Dean]." Gunter acknowledged that Dean was prone to violence.
Green testified on his own behalf. Green said he was disabled due to a back injury caused by a car accident. Green had surgery twice on his back. Green said that he had been unemployed due to the injury, drawing Social Security and insurance benefits. Green, who had been employed with seismograph companies for over twenty years, lived in a trailer near a sister. On October 31, 1988, Green's mother, who had been sick for several years, was in the hospital. Green "had to sit up with her at night." He had been staying with her at night for six to seven weeks.
For the "biggest part of the time," Green was in pain himself, which prevented him from sleeping. Sometimes, when he was unable to sleep, Green "would get out and go places," such as a beaver pond to hunt or into Mize to talk to a policeman he had befriended, Ken Kennedy. Green owned a "varmint rifle." Though he often had the rifle with him, he carried it for personal recreation only.
On October 31, 1988, Green visited his mother in the afternoon at the hospital, did chores at home, and then went into Mize to get supper. Green went back to his trailer and talked to his sister. Green's youngest *930 son stopped to see Green and borrow Green's truck for "trick or treating." Green's son returned the truck around 9:00 p.m., and they made plans to go squirrel hunting the next day. Green then watched television until midnight. He read a book until about 2:00 a.m. He decided to go to the beaver pond in his truck and carried his loaded rifle. He didn't see anything at the pond and didn't fire the rifle. Green returned to his trailer, but was still wide awake. He decided to go into Mize as he had done on previous occasions. He used his car. He took the rifle, placing it on the front seat with the barrel on the floorboard. Green proceeded north on Mississippi Highway 35 to the 4-way stop at the intersection with Highway 28 in Mize. He continued north. The Shell Station was on his right. He passed the Shell Station, took a right towards the east, and then took another right near the Western Auto in order to "make a block" and go home. He saw a police car beside the Shell Station. According to Green, when he got close to the police car, Dean stepped out of the police car. As Green's headlights became "even" with the police car taillights, Dean motioned for Green to turn into the parking area. Green turned into the parking lot and opened his own car door. The police car was facing south. Green's car was facing west toward the front of the police car.
According to Green, when he got out of his car standing between the door and the car, Dean said, "What [expletive deleted] are you doing in town this time of night?" Green told him he couldn't sleep and wanted to get out of the house for a while. Dean then said, "You're the [one] [expletive deleted] that's been going with my wife ain't you?" Green told him no. Green denied at trial that he had ever had an affair with Dean's wife. Dean next told Green, "I'm fixing to blow your [expletive deleted] brains out." Green held his hands up and said, "Hold it, Ralph. Hold it man. You've got this all wrong." Green was not holding his rifle. Green saw a pistol in Dean's right hand pointed at Green. Green said, "It just seemed like all of a sudden he just got real mad." Dean then shot at Green and missed. Green jumped in his car. Green grabbed his rifle and came out of his car backward shoving off the rifle safety. Green turned to face Dean. Dean fired again. Green started firing at Dean as fast as he "possibly could." Green was stumbling because of a weak left leg and trying to keep his balance. Green didn't know if he hit Dean, but he "lost him for just a minute ... he ducked in the car and went out of sight... . It was a split second." Green stopped firing. Then Dean "popped back out." Green started firing at Dean again and had regained his balance so that he had both hands on his rifle. Dean moved to the end of the police car door, still holding the pistol. The pistol was firing. When Dean got around the end of the car door, Green knew he had hit him because Dean fell against the side of the police car. Green didn't fire the rifle anymore. Dean then fell forward, not moving. Neither Green nor his car were hit by Dean's gunfire. Green walked across the street to a pay phone at the side of a drugstore on Main Street and dialed 911. Green told the lady who answered to call the sheriff because he had killed a man. Green walked back across the street and waited. Already terrified, Green became more afraid. He said he didn't remember getting in his car and leaving the scene. At home, he walked the floor the rest of the night, cried and "prayed some."
As daylight approached, Green's son arrived to go hunting and Green's sister called to relate the news that Dean had been killed. Green told his son the story he had heard from his sister. Green testified that he "knew what I needed to do and what I wanted to do" but "was scared to death. That's as scared as I've ever been in my life." On the hunting trip, Green didn't do any hunting. He just sat under a tree, cried, and prayed. Green took care of a couple of errands the afternoon of November 1 and stayed at home the rest of the day. On November 2, Green "got up enough courage" and called Bounds asking him to come to his trailer. Green then turned himself in.
*931 Green maintained throughout trial that Dean had fired the first shot, that Dean had a reputation for violence and jealousy, and that Dean would have killed him if he turned his back.
Green testified out of the jury's presence that he had received information through his sister regarding Dean's conduct indicating that Dean was violent. Green's sister told Green that Mrs. Dean had talked about Dean giving her a bad time, slapping her around, and twisting her arm when she changed the television channel on their wedding night. Green also knew about an incident when Mrs. Dean was at Green's sister's home. When Dean picked Mrs. Dean up, he asked, "What are you doing in there ... you and Cecil planning where y'all are going to meet next?" Green heard Mrs. Dean tell about Dean's observation that he could "do away" with her and a Mr. Pinkham and get rid of the bodies. He claimed nobody would bother him because he was a policeman. Mr. Pinkham began detouring Mize. Green knew that when Dean and Mrs. Dean took a trip to Texas, Dean had thrown Mrs. Dean out of the car when he thought he saw Mr. Pinkham. A milkman, David Bishop, had asked Green to look out for Mrs. Bishop because Dean had threatened her. Green also knew that Dean had been convicted in Justice Court for assault on a minor child. Green had been told that whenever Dean went into the store where Mrs. Dean worked, Dean gave Mrs. Dean a "hard time." Green testified that he knew of all these instances at the time Dean pulled him over in the early morning hours of November 1, 1988. However, this proffer of testimony was not admitted.
Ruth Ann Dean, widow of Ralph Dean, married Dean in 1984. Dean had surgery in February 1985. Outside the jury's presence, defense counsel made a proffer of Mrs. Dean's testimony regarding the surgery. Mrs. Dean told the court that Dean had a brain tumor removed. After the surgery, Dean would "get violent for no reason" and his jealousy "got worse." The court did not allow the jury to hear the testimony.
In Mize, the Deans ran a garbage route, and Mrs. Dean drove a school bus. She also worked at D & J's Hilltop Restaurant for a short time until Dean made her quit because he was jealous of her "being one on one." Mrs. Dean also worked at a supermarket until Dean made her quit for the same reasons.
Mrs. Dean testified that Dean's jealousy was unfounded. She also gave testimony that she knew that her husband had a reputation for jealousy and violence. She said Dean's moods would change "on the spur of the moment."
Mrs. Dean related Dean's activities leading up to the shooting. After Dean went to work on October 31, he returned to his home around 9:00 p.m. for supper. At this time, Dean changed guns, taking his personal gun. Dean told Mrs. Dean that he was jealous of Green and could "do away" with Green and no one would know because he was a police officer. Dean said he could "blow [expletive deleted] [Green] away." Mrs. Dean told Dean she was tired of all the accusations and would ask for a divorce if it didn't stop. She then told him to talk to Green if he didn't believe her. Dean returned to work. Mrs. Dean also said that Green's name was mentioned every hour by Dean for about three days before the shooting.
Five Mize residents testified as to Dean's reputation for violence. Ten Mize residents testified as to Green's reputation for peaceful behavior.

II.
Green contends the lower court erred in denying his requests for a peremptory instruction, judgment notwithstanding the verdict, or new trial because he was the only eye-witness and his testimony established that the homicide was justifiable and/or excusable and because his testimony was not materially contradicted by physical or other evidence. Essentially, Green is testing the sufficiency of the evidence. See Harveston v. State, 493 So.2d 365, 370 (Miss. 1986). This Court finds the Weathersby Rule was not applicable and the denial *932 of a peremptory instruction, j.n.o.v. or new trial was not error.
This Court must consider all the evidence in the light most favorable to the State with respect to each element of the offense. Harveston, 493 So.2d at 370; Fisher v. State, 481 So.2d 203, 212 (Miss. 1985); Callahan v. State, 419 So.2d 165, 174 (Miss. 1982). The credible evidence which is consistent with the verdict must be accepted as true, Spikes v. State, 302 So.2d 250, 251 (Miss. 1974), and the State has to be given the benefit of all favorable inferences which may be reasonably drawn from the evidence presented. Harveston, 493 So.2d at 370; Hammond v. State, 465 So.2d 1031, 1035 (Miss. 1985); Glass v. State, 278 So.2d 384, 386 (Miss. 1973). This Court may reverse the lower court's conviction only where the evidence is such that reasonable and fair-minded jurors could only find the defendant not guilty. Harveston, 493 So.2d at 370; Fisher, 481 So.2d at 212; Cook v. State, 467 So.2d 203, 208-209 (Miss. 1985).
In 1933, this Court set forth its decision that is commonly referred to as the Weathersby Rule. In Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933), this Court was faced with a situation where the only eyewitnesses to a homicide were the defendant and his wife. According to their testimony, a case of self-defense was sufficiently made out, but the State argued that the physical facts contradicted the story. This Court said:
It has been for some time the established rule in this [S]tate that where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the [S]tate, or by the physical facts or by the facts of common knowledge.
Weathersby, 147 So. at 482 (citations omitted). The Weathersby court found that pertinent circumstances corroborated the defendant's story as well as the uncontradicted reputation of the deceased in the community for violence. The Weathersby court noted that the physical evidence may have contradicted the defendant's version of the killing because the State put on evidence that the shot went through some growing corn in such a manner as to have shown that the defendant could not have been standing where he said he was standing. This Court reversed the defendant's conviction anyway and explained:
As we see it, under this particular record, these differences are in detail and not in controlling substance. The appellant and his wife ... appeared to have been considerably frightened as the deceased... approached... . Thus, as would be expected, there there [sic] are some minor discrepancies in the testimony ... which rather strengthens their testimony than weakens it, because this evidences the absence of a previously prepared and agreed story.
Id.
The Weathersby Rule is still applicable today. See Pritchett v. State, 560 So.2d 1017, 1019 (Miss. 1990); Blanks v. State, 547 So.2d 29, 33 (Miss. 1989); Lanier v. State, 533 So.2d 473, 490 (Miss. 1988). In fact, this Court has recognized that the Weathersby Rule is nothing more than a restatement of the standard of review, that:
[I]f the defendant and his witnesses are the only eyewitnesses to the homicide and if their version of what happened is both reasonable and consistent with innocence and if, further, there is no contradiction of that version in the physical facts, facts of common knowledge or other credible evidence, then surely it follows that no reasonable juror could find the defendant guilty beyond a reasonable doubt. Under such circumstances we have always mandated that peremptory instructions be granted whether under the label Weathersby or otherwise.
Harveston, 493 So.2d at 371; see also Pritchett, 560 So.2d at 1019.
It seems that a Weathersby analysis by this Court amounts to a de novo review.
In Buchanan v. State, 567 So.2d 194, 197 (Miss. 1990), the Court refused to hold the Weathersby Rule should have been applied *933 when the evidence showed the victim was shot in the back and the defendant claimed to have shot in self-defense while the victim was facing her. The Weathersby Rule was not found applicable in Thornhill v. State, 561 So.2d 1025, 1030-1032 (Miss. 1989), when the evidence conflicted and defendant's self-defense theory of the victim breaking into his home wielding a hammer was eroded by certain facts.
In the case sub judice, the physical evidence contradicts the version of events Green gave at trial. Thus, the Weathersby Rule does not control this case. Possibly the most striking contradiction is the bullet holes in the windshield and the rear window of the police car. Green testified that he fired the first shots from his rifle while stumbling from his car with his rifle and after Dean first shot at him from a standing position outside his patrol car. Green testified that the remainder of his shots were fired from a standing position beside the left front fender of his car. He drew a diagram on which he placed Officer Dean's car facing south and his own car facing west, toward Dean's car. He first testified that his car was about six to eight feet from Dean's, then that he and Dean were about twelve to eighteen feet apart. The rational inference drawn from that testimony is that Green's shots were fired on a line almost perpendicular to a line from back to front of Dean's car.
However, the physical evidence indicates otherwise. The windshield of the patrol car shows eleven bullet holes and the rear window shows six. Expert witnesses testified, and the jury could have logically inferred, that these bullet holes show that many shots were fired from almost directly in front of Dean's patrol car, with six of the bullets striking nothing and continuing out the rear window and five striking either Dean, while sitting in the car, or part of the car's interior. (Two bullets were found in the driver's headrest). The jury could have inferred, therefore, that Green lied when he stated that he fired all of the shots while Dean was standing outside the car and after Dean first shot at him.
Dr. Steven Hayne testified that he found a piece of blue plastic in the wound to Dean's right forearm. Joseph Andrews, a microanalyst with the Mississippi Crime Lab, testified that the plastic retrieved from Dean's arm was alike in all visual microscopic and chemical characteristics to the plastic of which the dashboard in Dean's patrol car was made. This leads to the inference that one of the bullets which passed through the windshield then travelled through the dash and entered Dean's forearm, carrying with it the plastic. Again, this contradicts Green's version by disputing his assertion that all of his shots were fired on a line perpendicular to Dean's car and while he was out of the car. Contrary to Green's closing argument, there was no evidence that the plastic could have come from the door area of the car, as no bullets were shown to have passed through the door.
Hayne also testified that the wound to Dean's forearm would have rendered him unable to hold a pistol. This contradicts Green's testimony that Dean was pointing his pistol at him immediately before Green fired the last shot, which all of the parties agree was the instantaneously fatal shot to the head. Green testified that he never raised the rifle to his shoulder and that he fired all shots from the hip, but Hayne's testimony contradicts this assertion. Hayne testified that two of the bullet wounds to the chest travelled on a downward trajectory. While Green testified that Dean ducked into the car momentarily during the shootout, he also testified that he quit firing during that moment, lessening the chance that one of the two bullets hit Dean while he had ducked into the car. Obviously, a bullet fired from the hip could not hit a standing man in the chest and travel downward. Thus, the evidence that the two bullets entered Dean's chest and travelled downward contradicts Green's version and lends credence to the prosecution's version; that these were some of the bullets fired through the windshield by Green stood at Dean sitting in the car.
Based on the ample evidence contradicting Green's version of the shootout, we *934 would hold the Weathersby Rule does not apply to this case.

III.
The lower court violated Rules 404 and 405(b) of the Mississippi Rules of Evidence when it unduly limited Green's opportunity to submit evidence of character traits of Dean and of specific acts of Dean, showing his turbulent and dangerous character, which were relevant to Green's claim of self-defense. The court also erred by disallowing the testimony of Dean's widow regarding Dean's behavior since the brain surgery of Dean.
The Mississippi Rules of Evidence allow introduction of specific acts of violence by a victim on previous occasions with third persons in a trial where a defendant is claiming self-defense.
Rule 404(a)(2) provides:
(a) Character Evidence Generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
* * * * * *
(2) Character of Victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution to rebut evidence that the victim was the first aggressor;
Rule 405, Methods of Proving Character, provides in subsection (b):
(b) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.
The comment to Rule 405 says that "[r]ecognizing that reputation evidence is nothing more than the opinion of a selected group, Rule 405 broadens the methodology to allow proof of character by opinion." In Day v. State, this Court held that "evidence of prior acts offered as having a bearing on the accused's state of mind, [is] an essential factor in determining whether a homicide is manslaughter or murder." Day v. State, 589 So.2d 637, 641 (Miss. 1991). This Court held that because the perpetrator's state of mind is essential in determining whether a homicide was murder, all evidence of surrounding circumstances that may have had a bearing on the defendant's state of mind should be admitted. Id. at 641. If the evidence would have played a significant role, that is, if it was exculpatory in nature and could not be obtained otherwise, exclusion by the trial judge presents reversible error. Tolbert v. State, 511 So.2d 1368, 1373 (Miss. 1987).
Rule 404 was essentially the law before the Mississippi Rules of Evidence were adopted. See Comment to Rule 404. Rule 405 created a broader method by which specific evidence under Rule 404 could be admitted. Thus, we hold that Rule 405 allows proof of specific instances of conduct to be admitted into evidence when character is an essential element of the accused's defense.
Applying Miss.R.Evid. 404(a)(2) and 405(b), this Court recently held that a lower court's refusal to allow a defendant to present evidence of a victim's propensity for violence was error because the evidence was relevant on the issue of the defendant's state of mind at the time of the shooting and on the issue of whether the victim may have been the initial aggressor. This Court said that a justifiable homicide defense renders the victim's propensity for violence an admissible pertinent character trait as long as the defendant has presented proof of an overt act of violence by the victim. Heidel v. State, 587 So.2d 835, 845 (Miss. 1991). As in Heidel, Green has claimed self-defense. Green has offered proof of Dean's initial overt act of violence, Dean's first shots, and has offered evidence relating Dean's propensity for violence. As in Heidel, such evidence should have been admitted. Exclusion is reversible error. In so holding, we overrule Newsome v. State, 197 Miss. 797, 20 So.2d 708 (1945), in which this Court held the dangerous character of the victim could not be *935 proven by his prior acts of violence, although the defendant had knowledge thereof.
Green also claims that the lower court was in error by not allowing Ruth Ann Dean to testify regarding Dean's bizarre and unusual behavior following his brain surgery. A federal case from 1960 decided by the D.C. Circuit Court of Appeals, Evans v. U.S., 277 F.2d 354 (D.C. Cir.1960), states that a victim's wife's testimony that the victim was mentally ill was relevant. The D.C. Circuit Court reversed the defendant's conviction because the testimony was relevant in corroborating the defendant's contention and because any evidence showing what kind of man the decedent was would be highly relevant in helping the jury to determine whether the defendant's story was truthful and would therefore serve the interests of justice. Id. at 356.
Although there does not appear to be a Mississippi case on point, the Evans decision is persuasive. Such testimony by Mrs. Dean was relevant pursuant to Miss. R.Evid. 402 and should have been admitted. However, a ruling on evidence is not error unless a substantial right of the party is affected. See Miss.R.Evid. 103(a). In the case at bar, a substantial right of Green was affected by the exclusion of Mrs. Dean's testimony about Dean's behavior since the brain surgery. The testimony would have supported Green's story and the jury may have acquitted Green.
In sum, Green's own testimony relating his personal knowledge of violent acts by Dean which Green knew about on the night of the shooting should have been admitted. Likewise, Mrs. Dean's testimony explaining her husband's violent behavior should have been admitted. Such preclusion by the lower court is reversible error.

IV.
The lower court did not err in allowing the jury to view Dean's police vehicle.
According to Sheriff Bounds, the police car remained at the Shell Station on the morning of the shooting until about 10 a.m. It was then taken to a parking lot behind the jail, and a tarpaulin was placed over it. The car remained there for about two months. Bounds then had the car placed in a shed and locked. Bounds was the only one with a key to the shed. Bounds testified that the last time he looked at the car it appeared in substantially the same condition as when he found it the night of the shooting, except that the back windshield had fallen out when it was being pulled by a wrecker. Bounds testified that the car was in the same condition as when he first saw it "except it's lots dirter [sic] than it was and I believe Mr. Dukes pointed out a dirt dober [sic] nest in it." The car did not appear to have been tampered with. The car was pushed into the open air out of the shed. The jury then viewed the car.
Green contends the lower court committed reversible error in allowing the jury to view the shot-up police car. Green argues that the automobile was not in substantially the same condition as it was at the time of the shooting and that the introduction into evidence was inflammatory, evidenced by two jurors who became ill while viewing the police car during the first trial. At trial, the State argued that the jurors fainting and getting sick were a result of the poor air circulation in the shed.
Green relies on general Mississippi law that inflammatory evidence is presumed harmful, Tudor v. State, 299 So.2d 682 (Miss. 1974), and that it is error to introduce extraneous and prejudicial matters before a jury, McDonald v. State, 285 So.2d 177 (Miss. 1973).
Miss. Code Ann. § 13-5-91 (1972) says in pertinent part:
When, in the opinion of the court, ... it is proper, in order to reach the ends of justice, for the court and jury to have a view or inspection of .. . the place at which the offense is charged to have been committed, or the place or places at which any material fact occurred, or of any material object or thing in any way connected with the evidence in the case, the court may, at its discretion, enter an order providing for such view or inspection as is herein below directed.
*936 As this Court observed in Tolbert v. State, 511 So.2d 1368 (Miss. 1987), when interpreting § 13-5-91, the trial court has discretionary authority to allow the jury to view or inspect the place at which an offense has allegedly been committed. And this Court will reverse only in the event of a clear abuse of discretion. Id. at 1378.
A view should not be permitted where material changes have taken place. A view should not be permitted unless it will be of essential aid to a jury and it is distinctly impracticable to present photographs, diagrams, and measurements. See National Box Co. v. Bradley, 171 Miss. 15, 157 So. 91, 95 ALR 1500 (1934). This Court has found error where the lower court allowed a viewing with no justifiable reasons for the inspection stated, and where the scene was 20 miles from the courthouse, ranged over distance of a quarter of a mile, and the viewing took place at a different time of year. See Leflore v. State, 196 Miss. 632, 18 So.2d 132 (1944).
The police car was in substantially the same condition as when the shooting occurred. Bounds testified that it was dirtier and that a dirt dobber had built a nest in it. He also said that the back windshield had fallen through since the shooting incident. These differences were told to the jury. The two jurors who became ill during the first trial when viewing the car became ill due to heat and poor air circulation, according to the State. No jurors became ill during the second trial.
The trial court did not abuse its discretion. The State justified the inspection, and the police car was housed nearby. It is also reasonable that the inspection was an aid to the jury so that the location of bullet holes could be seen as well as further damage to the vehicle. These details would be difficult to depict in a photograph. There is no indication that the trial court committed clear error in his ruling that the jury should view the police car. This assignment of error is without merit.

V.
Dean was a law enforcement officer at the time of his death and was acting within the scope of his duties. The indictment upon which Green was tried and convicted correctly charged Green with the crime of capital murder, and the court instructed the jury appropriately.
Green urges this Court to reverse his conviction because the indictment is fatally defective, for the reason that it charged Green with the "killing of Ralph Dean while acting in his official capacity ... with knowledge that the victim was a peace officer." Green claims that pursuant to Miss. Code Ann. § 45-6-11 (1972), Dean was not authorized to exercise the powers of an officer. Green explains that Dean had one year from the date of his hiring within which to obtain his certification from the State of Mississippi Board on Law Enforcement Standards and Training and that Dean did not have this certification. Green says Dean was therefore not an officer at the time of the shooting.
Clark testified that Dean had been with the Police Department for about 14 months before his death. Dean had been a part-time police officer until about three or four months before his death when he had become full-time. He was full-time at the time of his death. Dean had not been provided any training by the Mize Police Department.
Miss. Code Ann. § 45-6-3(c) defines a law enforcement officer as "any person appointed or employed full time by the State or any political subdivision thereof, who is duly sworn and vested with authority to bear arms and make arrest, and whose primary responsibility is the prevention and detection of crime, the apprehension of criminals and the enforcement of the criminal and traffic laws of this state and/or the ordinances of any political subdivision thereof." (emphasis added) Dean certainly fit into this definition of a law enforcement officer at the time of his death.
Green's contention that Dean was not an officer because he lacked the required certification is without merit. According to Miss. Code Ann. § 45-6-11(2), no "person shall be employed as a law enforcement officer by any law enforcement unit for a *937 period to exceed one (1) year unless that person has been certified as being qualified." Dean only met the definition of a law enforcement officer for about three or four months since a law enforcement officer is a person employed full-time. Dean still had eight or nine months until certification was necessary.
This assignment of error is without merit.

VI.
The conviction of the lower court is reversed because Green's testimony about his own knowledge of Dean's reputation for violence and Mrs. Dean's testimony about her husband's behavior since his brain surgery should have been admitted under Rules 404 and 405(b). We reverse the conviction of Green and remand the case for a new trial.
REVERSED AND REMANDED.
DAN M. LEE, P.J., PRATHER, SULLIVAN, and BANKS, JJ., concur.
HAWKINS, P.J., dissents with separate written opinion joined by ROY NOBLE LEE, C.J.
McRAE and ROBERTS, JJ., not participating according to Supreme Court Internal Rules.
HAWKINS, Chief Justice, dissenting:

[Filed Feb. 4, 1993]
I respectfully dissent.
If this Court is going to reverse any case, especially a criminal case of this gravity, I respectfully suggest we owe the parties and trial judge the minimum obligation of setting forth clearly from the record what happened at trial, and just why it was erroneous.
The majority opinion sets forth some legal principles with which I have no disagreement, and then states the following:
Green has offered proof of Dean's initial overt act of violence, Dean's first shots, and has offered evidence relating Dean's propensity for violence.... Exclusion is reversible error.
Majority Opinion, p. 934.
The majority opinion does not enlighten us as to what the trial court did, or how the trial court erred in its ruling of any of this.
The record clearly shows, as the majority states at some length, that Green (the only eyewitness to the slaying) offered in graphic detail proof of Dean's "initial overt act of violence," and "Dean's first shots," and "evidence relating to Dean's propensity for violence." As will be shown below, Dean's widow testified as to his behavior, and the defense put on eight witnesses who testified that Dean had a bad reputation for jealousy and violence. Nine defense witnesses testified that Green had a good reputation for peace or violence as well as for veracity. Defense counsel then stated to the circuit court that he did not desire to put on any more witnesses thereasto because the evidence would be cumulative. The defense was offered the opportunity to offer into evidence all evidence of threats made by Dean against Green, whether communicated or not, and Dean's widow, as set forth below, did specifically relate an incident of Dean's jealousy towards Green and his threat. No threats whatever were made by Dean directly to Green.
From my review of the record, it is clear, at least to me, that all these acts and personality traits were given to the jury in meticulous and abundant detail under the skilled panoply of an able defense counsel.
Then where, and in what manner, did the circuit court exclude Dean's "initial overt act of violence, Dean's first shots," and Dean's "propensity for violence."? Majority Opinion, p. 934. The majority does not enlighten us.
If there ever was a jury which was informed that the decedent was a jealous and violent person, that he had threatened to kill the defendant, and the defendant had good reason to be afraid of him, the Smith County jury which heard this case was one.
*938 Then what was the grievous error thereasto for which the majority reverses? We are not told.
The record reveals that Green did seek to introduce into evidence through himself that his sister had told him if he went into the store where Mrs. Dean worked, Dean would give his wife a bad time. Also, that his sister had told him that Mrs. Dean told her about Dean's violence on the night they married. She also told him of Dean making a threat in the presence of Mrs. Dean and herself against Green. She also told him that she had heard from Mrs. Dean about threats made against the life of another person. He also wanted to tell of a conversation he overheard where some women in a local restaurant were gossiping over threats Dean had made against a Mr. Pinkham. Finally, he wanted to tell about a conversation between himself and one David Bishop wherein Bishop asked him, Green, to help him protect Mrs. Bishop, who Bishop said was being intimidated by Dean.
The circuit judge ruled that "any evidence that you have on the victim's reputation for violence or jealousy would be admissible," and "any threats made by the victim against this Defendant, if made in a reasonable time and were communicated to him by whatever method, hearsay or whatever, would be admissible." (R.III, 300).
What did the circuit judge exclude?: "Any specific act of violence that this Defendant does not have personal knowledge of would be not admissible." (R.III, 300). This was all the circuit judge excluded.
As will be shown below, when Mrs. Dean testified, the defense was given the opportunity to prove first hand all acts of jealousy Dean demonstrated in her presence, whether made in reference to Green or someone else, not necessary to rely upon any of them by hearsay.
While the majority does not tell us, it must be reversing upon the above ruling, because as to everything else, the defense was given a free hand by the very able circuit judge. The majority cites no case which supports the right of an accused in a homicide claiming self-defense to relate hearsay testimony, and second- and third-hand hearsay testimony at that, of acts of violence of the victim. I would be more comfortable if it could give us some respectable authority for such a holding. The majority does cite Heidel v. State, 587 So.2d 835, 845 (Miss. 1991); Day v. State, 589 So.2d 637 (Miss. 1991); and McDonald v. State, 538 So.2d 778 (Miss. 1989). None of these supports today's holding.
Under the majority's holding, any defendant who slays another when there are no living eyewitnesses but himself and claims self-defense can offer into evidence in graphic detail anything he pleases of specific acts of violence he claims he heard from somebody else. It does not matter whether they are true or false. Thus the murdered victim has not only lost his life but had his name smeared by the live defendant. The trial becomes a character assassination of the victim by hearsay and gossip.
Even more strange is the majority's characterization of the circuit judge's ruling on the testimony of Mrs. Ruth Ann Dean, and somehow gleaning a reversible error there. Let us first repeat what the majority tells us.
Mrs. Dean told the court that Dean had a brain tumor removed. After the surgery, Dean would get "violent for no reason" and his jealousy "got worse." The court did not allow the jury to hear the testimony.
Majority Opinion, p. 931.
Green also claims that the lower court was in error by not allowing Ruth Ann Dean to testify regarding Dean's bizarre and unusual behavior following his brain surgery.
Majority Opinion, p. 935.
In the case at bar, a substantial right of Green was affected by the exclusion of Mrs. Dean's testimony about Dean's behavior since the brain surgery. The testimony would have supported Green's story and the jury may have acquitted Green.
Majority Opinion, p. 935.
Now, any reader would gather from reading this that the circuit court excluded *939 evidence by Mrs. Dean pertaining to Dean's behavior following surgery. What does the trial record show?
Dean and Mrs. Dean married in December, 1984, and in the following February he had brain surgery to remove a tumor.
The circuit court ruled as to testimony that he had brain surgery:
BY THE COURT:
I've already ruled that I was going to let her say that he was jealous, but I'm not going to let her go into the reasons or what caused him to be jealous. I'm going to sustain the objection.
... .
BY THE COURT:
As the Court views it, it doesn't matter why he was that way, it only matters if he was that way. For that reason, I'm going to sustain the objection . .."
(R.III, 350-351).
Following this Mrs. Dean testified that her husband, Ralph, "didn't want me working in the restaurant." Why? "Because of being one on one for that many people." He was "Jealous." (R.III, 354). She worked for a supermarket in Mize, but quit there as well. "What was your reason for leaving there?" "Ralph's jealousy."
Mrs. Dean proceeded to testify that her husband had a bad reputation in the community for having a jealous personality. (R.III, 355). She then told the jury that although she loved her husband, one thing about him that she did not like was his "jealousy." She also told the jury that her husband had no reason to be jealous of her. Then she told the jury that her husband had a bad reputation for peace or violence. (R.III, 356).
The record does not end here. Mrs. Dean informed the jury as a defense witness that she and her husband had held conversations on more than one occasion about Cecil Green, of whom he was jealous, and that there was no factual basis for this. (R.III, 356).
She detailed the conversation they had the night of the killing:
Q. Would you tell us the substance of that conversation.
A. He said he was jealous and because he was a police officer that he could do away with Cecil Green and no one would know. He said he could blow his shit away.
Q. Is that the words he used?
A. Yes, sir.
Q. I'm sorry you have to use that language, but is that exactly what he said, ma'am?
A. Yes, sir.
(R.III, 358-359).
Mrs. Dean then told the jury that she told her husband that if "it didn't stop" that she would "apply for a divorce, that I couldn't go on any longer." She told the jury that such accusations did not apply just to Cecil Green, the defendant, but others as well. (R.III, 359).[1]
On re-direct defense counsel ventured into Dean's mood changes.
A. You never knew how his moods would change. He would be in a good, loving mood one minutes, and if there wasn't enough ice in the tea glass, he would get mad and throw the glass and just get mad for no reason.
Q. On the spur of the moment?
A. On the spur of the moment.
... .
Q. And then you used the phrase of "split personality." Explain what you meant to him about that 
A. What I meant?
Q.  about your husband?
A. Well, that's what I had just said, about him having his good sides and his loving, caring moments, but then when he would get mad or jealous  he can hear a car honk going the road while I was mowing the yard and he *940 would want to know who it was, why they were honking, and just go into a rage because he heard a horn honk, and then when he would get so mad that I was scared, he would laugh about it and say "I'm sorry."
Q. Is that what you mean by a split personality?
A. Yes, sir.
BY MR. DUKES:
I think that's all, Ms. Dean. Thank you, ma'am.
(R.III, 368-69).
There is not one word in this record revealing any impediment either by the prosecution or the circuit court as to Dean's behavior, including the supposed incidents which Green said his sister told him. Every question defense counsel asked and every answer Mrs. Dean gave was without objection.
Omitting facts saves a world of explanation.
The only evidence the circuit court excluded was testimony from Mrs. Dean that shortly after her marriage to him Dean had surgery to remove a brain tumor. The majority, of course, recognizes that exclusion of this testimony was inconsequential, because it finds no fault there. The majority reverses because the court excluded evidence "about Dean's behavior since the brain surgery." Majority Opinion, p. 935.
The record in this case is barren of any such "exclusion."
No Mississippi Rule of Evidence or decision of this Court authorizes a defendant in a homicide case claiming self-defense to offer into evidence hearsay testimony of specific acts of violence of the decedent to bolster this defense.
Shinall v. State, 199 So.2d 251 (Miss. 1967), is instructive. In that case the defendant sought, among other things, to introduce evidence of the bad reputation of the deceased for violence, and particular acts of violence. This Court first noted that ordinarily the character or reputation of a decedent for violence was not relevant, because it was just as much murder to kill a violent as a peaceful man. We went on to point out certain exceptions. The dangerous character of a decedent could be proved by testimony of his general reputation for peace or violence "where it is doubtful as to who the aggressor was at the time of the homicide." Shinall, 199 So.2d at 257. A condition precedent to the admission of such character evidence, however, was some testimony that the defendant acted in self-defense.
Shinall also makes clear that the method of proving a decedent had a propensity for violence was by testimony of his reputation for peace or violence. Shinall, 199 So.2d at 257; see also Ray v. State, 381 So.2d 1032, 1036 (Miss. 1980).
Finally, Shinall holds: "Testimony of antecedent specific acts of violence alleged to have been committed by the deceased was not admissible to show bad character." Shinall, 199 So.2d at 258; see also Ray, 381 So.2d at 1036.
Significantly, Shinall is singled out in the commentary under Rule 404, Miss. R.Evid., to further explain and give the scope of the rule, and that the rule makes no marked change in our decisions on evidence.
Upon raising the issue of self-defense, Green quite properly could, and did, offer testimony as to the reputation of the decedent for peace or violence. The obvious purpose of such testimony was to show that at the time of the slaying, the decedent was acting in conformity with his violent character, thus giving Green reasonable apprehension his own life was in danger. This, however, under the rule is as far as he was permitted to go.
Rule 404(b) states:

(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. (Emphasis added)
A paragraph of the commentary to Rule 404 explains the reason:
The difficulty surrounding character evidence is with regard to its inferential *941 use. When a party attempts to prove that a person has a certain character trait and that he acted in accordance with it, the court will exclude the testimony. To do otherwise is to prejudice the person, to render him in the eyes of jurors liable, not because of what he did or did not do in the instant case, but because of what he has done or failed to do in the past. Floyd v. State, 166 Miss. 15, 148 So. 226 (1933); Eubanks v. State, 419 So.2d 1330 (Miss. 1972); Riley v. State, 254 [Miss.] 86, 180 So.2d 321 (1965). This particular kind of circumstantial evidence most often appears in criminal cases. The general rule serves as a bar to the introduction of the inferential evidence. U.S. v. Cochran, 546 F.2d 27 (5th Cir.1977); Davis v. State, 431 So.2d 468 (Miss. 1983).
As the commentary to them demonstrates, Rules 404 and 405 are essentially restatements of this State's common law decisions on evidence when promulgated January 1, 1986. There is nothing about the rules permitting the introduction of evidence as the majority this day permits. The rule of relevance under Rule 401 is a two-way street. In admitting testimony concerning previous specific acts of the decedent on the ground that they were "relevant," the majority opens the door for the State to offer similar specific acts against the accused in criminal cases, which this Court once again took pains to condemn in Eubanks v. State, 419 So.2d 1330, 1331 (Miss. 1982), cited in the comment to Rule 404:
The reason and justice of the rule is apparent, and its observance is necessary to prevent injustice and oppression in criminal prosecutions. Such evidence tends to divert the minds of the jury from the true issue, and to prejudice and mislead them, and, while the accused may be able to meet specific charge, he cannot be prepared to defend against all other charges that may be brought against him. "To permit such evidence," says Bishop, "would put a man's whole life in issue on a charge of a single wrongful act, and crush him by irrelevant matter, which he could not be prepared to meet. 1 Bish.Crim.Proc. § 1124 (166 Miss. at 35, 148 So. at 230). [Massey v. State] 393 So.2d [472] at 474 [(Miss. 1981)]."
Eubanks, 419 So.2d at 1331.
Unfortunately, the majority goes even further than simply permitting evidence of specific acts of violence by the decedent against persons other than the defendant; egregiously, it permits hearsay testimony as to such acts. A casual perusal of the record shows that the excluded evidence was, for the most part, rank hearsay of specific threats of violence against third persons.
The majority offers Day v. State, 589 So.2d 637 (Miss. 1991) as authority supporting its position. The opinion states that in Day "this Court held that evidence of prior acts offered as having a bearing on the accused's state of mind, [is] an essential factor in determining whether a homicide is manslaughter or murder." The majority might have considered the difference in the Day issue and this cause as well as our later language in Willie Russell v. State, 607 So.2d 1107 (Miss. 1992). In Russell, we stated:
In Day, the victim's acts were directed towards the defendant and were, therefore, relevant and admissible to show the relationship between the victim and the defendant and, more particularly, to show the defendant's state of mind, not the victim's character. In the case sub judice, the victim's acts were directed toward third parties... . (Emphasis added)
We affirmed exclusion of proffered evidence in Russell.
There is a very important distinction between Day in which the defendant claimed shooting the decedent was accidental, and here where the claim is that it was done in necessary self-defense. In Day the jury was required to determine the state of mind of the defendant at the time he shot the victim, did he mean to kill him or simply to frighten him by shooting towards him. In this case no such issue is involved, there being no question but that Green meant to kill Dean. The only question is *942 whether or not he did so in necessary self-defense. Miss. Code Ann. § 97-3-15(1)(f) (Supp. 1992) makes a homicide justifiable if committed "in the lawful defense of one's own person ... where there shall be reasonable ground to apprehend a design ... to do some great person injury ... and there shall be imminent danger of such design being accomplished." As any lawyer who ever defended or prosecuted a homicide in which the claim of self-defense was imposed well knows, the test has never been paranoia of the defendant, but whether or not from the circumstances of the case he had reasonable ground to believe that at the moment he killed the decedent that his life was in danger. Buchanan v. State, 567 So.2d 194, 198 (Miss. 1990); Bright v. State, 349 So.2d 503 (Miss. 1977); Stennis v. State, 234 So.2d 611 (Miss. 1970); Shinall v. State.
The effect of the majority holding is clear and ominous. It holds that a defendant on trial in a criminal case, by asserting his victim was the aggressor, can testify via rank hearsay pertaining to specific instances of reputed violence by the victim. Moreover, the hearsay testimony can relate to any acts of reputed violence toward some purported third party with the State having no way of ascertaining prior to his taking the witness stand what the testimony of the defendant thereasto will be. Capsuled, the majority opens the barn door for destruction of a victim's character by unsupported rumors of specific alleged misconduct not capable of being refuted by the State.
The majority has dynamited the levee on the river of evidence, and I respectfully dissent.
NOTES
[1] Mrs. Dean's testimony was somewhat weakened on cross-examination when she conceded that her memory at trial was better than it was when the law enforcement officers interviewed her two years previously. This is neither here nor there, however, my whole point being that the defense was offered every opportunity to put on evidence as to Dean's behavior and did so.