# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-01527-COA

**RODISE JENKINS A/K/A RODISE JENKINS, III**　　　　　　**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**　　　　　　　　　　　　　　　　**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/28/2016 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE MCMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED: 02/13/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., BARNES AND FAIR, JJ.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1. Rodise Jenkins was convicted of murder by deliberate design in violation of Mississippi Code Annotated section 97-3-19(1)(a) (Supp. 2017). He was sentenced to life in the custody of the Mississippi Department of Corrections. On appeal, he argues that the jury was improperly instructed and that evidence of the victim's criminal history was improperly excluded. We find no error and affirm.

## FACTS

¶2. Hazel Turner lived in Biloxi, Mississippi, with her boyfriend, Jenkins. Turner's son,

Anthony Wheaton, also lived in Biloxi. On October 11, 2014, at 2 a.m., Nyra Jenkins, Jenkins's ex-wife, called Jenkins's telephone, and Turner answered. Nyra proceeded to harass Turner over the phone as she had done in the past. Once Jenkins arrived home from work about 5 a.m., he and Turner spoke about Nyra and the possibility of filing for a restraining order against her. Jenkins then called Nyra and spoke with her about the calls.

¶3. Turner and Jenkins were upset over the Nyra situation and the harassing phone calls. While Jenkins slept, Turner made three calls to different family members to talk, one of whom was Wheaton. Shortly after 2 p.m. that same day, Turner and Jenkins were seated in the kitchen talking when Wheaton walked into the house. Together in the kitchen, they continued the conversation about Nyra and the possible restraining order. The conversation grew more intense as Jenkins became agitated and no longer wished to discuss it with Wheaton. The two stood up and faced each other. Turner sensed something was wrong and jumped in between Jenkins and Wheaton to de-escalate the situation.

¶4. While Wheaton and Turner moved toward the front porch, Jenkins left through the back door of the house and headed toward his truck. Once at his truck, Jenkins realized he had forgotten his wallet and keys inside. He grabbed his gun from the truck and walked around to the front of the house where Wheaton and Turner were standing. Jenkins shot at Wheaton three times, and hit him twice. Wheaton and Turner then ran into the house, and Jenkins followed. Jenkins walked up to Wheaton and shot him two more times from close range. Wheaton died as a result of multiple gunshot wounds.

¶5. Turner then called 911 while Jenkins fled the scene. He was quickly apprehended and

2

arrested without resistance.

ANALYSIS

I. *Whether it was error to refuse Jenkins's proposed manslaughter instruction.*

¶6. Jenkins argues he was entitled to have the jury instructed on manslaughter. Jenkins submitted proposed jury instruction D-16, which would have instructed the jury "that the killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without the authority of law, and not [in] necessary self[-]defense, shall be manslaughter." He also submitted proposed instructions D-15 to define "heat of passion" and D-17 to instruct the jury to proceed to consideration of manslaughter if the jury found Jenkins not guilty of murder. All three instructions were refused by the trial court on the ground that there was no evidence in the record to support the assertion that Jenkins killed Wheaton in a state of violent and uncontrolled rage.

¶7. It is well settled that jury instructions generally are within the discretion of the trial court. *Davis v. State*, 18 So. 3d 842, 847 (¶15) (Miss. 2009) (citing *Higgins v. State*, 725 So. 2d 220, 223 (¶15) (Miss. 1998)). Further, jury instructions must be considered together:

> [i]n determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. There is no error if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law.

*Newell v. State*, 49 So. 3d 66, 73-74 (¶20) (Miss. 2010) (quoting *Rubenstein v. State*, 941 So. 2d 735, 784-85 (¶224) (Miss. 2006)). Additionally, we have explained that "[a] defendant

3

is entitled to have jury instructions given [that] present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction that incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Hearn v. State*, 3 So. 3d 722, 738 (¶45) (Miss. 2008) (quoting *Chandler v. State*, 946 So. 2d 355, 360 (¶21) (Miss. 2006)).

¶8.     A lesser-included-offense instruction should be denied only when the court finds that "no reasonable jury could find the defendant guilty of the lesser[-]included offense," and, conversely, "not guilty of at least one essential element of the principal charge." *Harper v. State*, 478 So. 2d 1017, 1021 (Miss. 1985). In other words, "a lesser-included[-]offense instruction is authorized if a rational or reasonable jury could find the defendant not guilty of the principal offense in the indictment, but guilty of the lesser-included offense." *White v. State*, 842 So. 2d 565, 575 (¶30) (Miss. 2003). Therefore, "[o]nly in cases where the evidence could only justify a verdict of murder, should a requested manslaughter instruction be refused." *Ruffin v. State*, 444 So. 2d 839, 840 (Miss. 1984).

¶9.     In his brief, Jenkins repeatedly relies on Turner's trial testimony to show how she observed Jenkins to be feeling. Turner—not Jenkins—testified that Jenkins seemed angry, agitated, frustrated, mad, and even "beyond rage." In fact, Jenkins repeatedly denied that he was angry at all, much less "beyond rage." Jenkins testified that he was afraid, terrified, in fear for his life, and frightened, and that he acted to defend himself. This testimony was inconsistent with the requirements for manslaughter.

¶10.    Jury instruction D-15 defined "heat of passion" as "a state of violent and

4

uncontrollable rage engendered by a blow or certain other provocation given, but the passion must be the result of immediate and reasonable provocation arising from words or acts of the victim." Wheaton confronted Jenkins at the home Jenkins shared with Turner. That fact is not in dispute. After the confrontation in the kitchen, Jenkins fled the house and went to his truck. He then realized he had forgotten his wallet and keys, but instead of returning through the back door he had just exited in order to retrieve them, he grabbed a loaded gun and headed to the front of the house in Wheaton's direction.

¶11. Jenkins then shot Wheaton. This act was not an immediate response to anything Wheaton did. Jenkins testified that he was reacting out of fear to an action by Wheaton. However, after the first three shots were fired at Wheaton, Jenkins did not gather his keys and leave; instead, he followed Wheaton back into the house. Jenkins saw Wheaton on the floor and shot him again, this time from close range, in the head.

¶12. A significant amount of time passed between Jenkins' and Wheaton's interaction in the kitchen and when Jenkins shot Wheaton. "[A] heat-of-passion jury instruction is not warranted where a cooling-off period exists between the provocation and the killing." *Sanders v. State*, 103 So. 3d 775, 779 (¶13) (Miss. Ct. App. 2012). Although "[a] defendant is entitled to have jury instructions given [that] present his theory of the case . . . ," the court may refuse the instruction if it "is without foundation in the evidence." *Hearn,* 3 So. 3d at 738 (¶45). Because of the lack of an evidentiary foundation and the fact that no reasonable jury could find the defendant guilty of the lesser-included offense of manslaughter, the trial judge did not err when he refused the proposed jury instructions on manslaughter. *Harper*,

5

478 So. 2d at 1021.

> II.    *Whether the trial court erred in granting jury instruction S-9, an instruction on the use of deadly force.*

¶13.    After the trial judge gave jury instruction S-9, Jenkins made a general objection to the use of the instruction without any further explanation. There remains a question as to whether the point was effectively preserved for appeal:

> [T]he rule of this Court [is] that no assignment of error based on the giving of an instruction to the jury will be considered on appeal unless specific objection was made to the instruction in the trial court stating the particular ground or grounds for such objection. However, in extreme cases, this Court may raise an objection to a jury instruction in order to prevent manifest injustice.

*Watson v. State*, 483 So. 2d 1326, 1329 (Miss. 1986). "A corollary of this is that a general objection to a jury instruction does not suffice to preserve the issue for appeal." *Id.* (citing *Holifield v. State*, 431 So. 2d 929, 930 (Miss. 1983)). Therefore, since Jenkins failed to adequately preserve this issue for appeal, it can only be analyzed under the plain-error doctrine to determine if there was an error resulting in a manifest miscarriage of justice.

¶14.    To prevail under the plain-error doctrine, an appellant must show that an error occurred that resulted in a "manifest miscarriage of justice." *Flora v. State*, 925 So. 2d 797, 811 (¶42) (Miss. 2006). Jenkins failed to adequately preserve the issue for appeal with a specific objection. However, notwithstanding the waiver, we still cannot conclude based upon our review of the record that there was an error that caused manifest injustice.

¶15.    Jenkins alleges jury instruction S-9 contained an incorrect statement of the law and subsequently diluted Jenkins's evidence that he acted in self-defense. The instruction was one of deadly force, which stated that when a person defends himself from an assault with

6

a deadly weapon, he "acts at his peril." Courts have condemned the phrase "acts at his own peril" from future jury instructions as a confusing, incorrect statement of the law. *Scott v. State*, 446 So. 2d 580, 583-84 (Miss. 1984). If a person is acting reasonably under the belief his life is in danger, there is no peril. *Id.*

¶16.    Jenkins cites *Flowers v. State*, 473 So. 2d 164 (Miss. 1985), *Johnson v. State*, 908 So. 2d 758 (Miss. 2005), and *Blunt v. State*, 55 So. 3d 207 (Miss. Ct. App. 2011). "*Flowers*, *Johnson*, and *Blunt* make it clear that the 'at peril' phrase is incorrect. That does not end the inquiry, however. No supreme court decision holds that use of the 'he acts at his own peril' language in a self-defense jury instruction is 'per se' reversible error." *Rodgers v. State*, 166 So. 3d 537, 547 (¶30) (Miss. Ct. App. 2014).

¶17.    In *Flowers*, unlike in the present case, "the State's evidence was fraught with inconsistencies"; the supreme court noted that "it [was] especially important in a factually close case that the jury be properly instructed." *Flowers*, 473 So. 2d at 166. The facts in the present case are undisputed. The trial court instructed the jury numerous times on Jenkins's right to self-defense through instructions other than S-9. These instructions included Jenkins's right to stand his ground; his right to use a deadly weapon if the victim was larger and stronger than Jenkins, even if the victim was without a weapon; as well as additional general laws on self-defense.

¶18.    "In reviewing challenges to jury instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Rodgers*, 166 So. 3d at 544 (¶16)

7

(quoting *Johnson*, 908 So. 2d at 764 (¶20)). "When considering the numerous and detailed instructions on self-defense given the jury, the jurors could not have been in hopeless conflict over the instructions." *Id.* at 547 (¶30). We can find no evidence of a "manifest miscarriage of justice" that seriously affects the fairness, integrity, or public reputation of the judicial proceeding. Accordingly, we find no plain error.[1]

> III.　　*Whether the trial court erred in excluding evidence of Wheaton's prior convictions.*

¶19.　Jenkins argues that evidence of Wheaton's prior convictions should have been allowed into evidence in order to show Wheaton's violent nature. Jenkins wished to lay the basis for his self-defense claim using these prior convictions. "The standard of review regarding admission or exclusion of evidence is abuse of discretion. We will not reverse the trial court's evidentiary ruling unless the error adversely affects a substantial right of a party." *Mingo v. State*, 944 So. 2d 18, 28 (¶27) (Miss. 2006) (citing *Parks v. State*, 884 So. 2d 738, 742 (¶9) (Miss. 2004)). *See also* M.R.E. 103(a).

¶20.　In 2010, Wheaton was convicted of carrying a concealed weapon. In 2012 and 2013, Wheaton was convicted of domestic violence. During the State's case-in-chief, Jenkins offered authenticated court abstracts of these criminal judgments to prove Wheaton's violent

---

[1] As the supreme court has stated:

> We do not condone what we can only assume was the careless submission of the challenged jury instruction. The prosecution certainly acted at its peril in submitting an instruction containing language as strongly condemned as the "at peril" language in the challenged instruction. That it did not rise to the level of plain error in this case does not mean that it will not in a future case.

*Rodgers*, 166 So. 3d at 547 n. 2.

8

nature. Jenkins first attempted to question Turner about the convictions in a proffer of the evidence outside the jury's presence, but the trial court sustained the State's objection and excluded the evidence. The trial court determined that because Turner was unaware of exactly what Wheaton had been convicted of, did not press charges herself, was not certain who did press charges, and never told Jenkins about the convictions, there was no evidence to suggest that Jenkins knew of Wheaton's prior convictions.

¶21. It was not until after Jenkins testified and stepped down from the witness stand that he offered the court abstracts of Wheaton's convictions as a composite exhibit. The State objected, and the trial court sustained the objection on the grounds that the convictions occurred before Jenkins and Turner moved in together, they did not involve Jenkins as either a party or a witness, and Jenkins did not have knowledge of the actual convictions.

¶22. Ordinarily, specific instances of conduct may be used on both direct and cross-examination when the pertinent trait of character being examined is an "essential element of a charge, claim, or defense." M.R.E. 405(b). Wheaton's violent nature would be relevant to Jenkins's charge of murder and claim of self-defense. However, Jenkins failed to introduce these specific instances during direct or cross-examination.

¶23. Notwithstanding the procedural bar, we cannot find that Wheaton's prior convictions had any impact on Jenkins's defense. Jenkins cites *Heidel v. State*, 587 So. 2d 835 (Miss. 1991), *Green v. State*, 614 So. 2d 926 (Miss. 1992), and *Jordan v. State* 211 So. 3d 713 (Miss. Ct. App. 2016), as examples of violent-crime convictions that have been overturned because evidence of the victims' violent nature was not admitted into evidence. However,

9

each of these cases differs from the present case. In each *Heidel*, *Green*, and *Jordan*, the defendant and the victim had a close, private relationship in which violence between the two had occurred prior to their respective crimes. Here, the record does not support Jenkins's allegations of previous violent encounters with Wheaton, nor is there any evidence that Jenkins had personal knowledge of previous violent encounters between Wheaton and anyone else.

¶24.    In *Heidel*, *Green*, and *Jordan*, the defendants' verdicts were reversed because they were denied the opportunity to submit evidence of instances they personally experienced and had personal knowledge of. Because Jenkins was unaware of Wheaton's prior convictions, he could not have considered Wheaton's violent past when he decided to shoot Wheaton. The convictions were irrelevant to Jenkins's state of mind at the time he shot Wheaton and his subsequent self-defense theory. Therefore, the trial court did not err when it excluded evidence of Wheaton's prior convictions.

*IV.    Whether Jenkins received ineffective assistance of counsel.*

¶25.    Jenkins argues that he received ineffective assistance of counsel due to his trial counsel's failure to request and procure a manslaughter instruction on the theory of imperfect self-defense. To prove ineffective assistance of counsel, Jenkins must show: (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. To overcome this presumption, Jenkins "must show that there is a

10

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

¶26. However, the Mississippi Supreme Court has stated:

> It is unusual for this court to consider a claim of ineffective assistance of counsel when the claim is made on direct appeal. This is because we are limited to the trial court record in our review of the claim[,] and there is usually insufficient evidence within the record to evaluate the claim. . . . [W]here the record cannot support an ineffective[-]assistance[-]of[-]counsel claim on direct appeal, the appropriate conclusion is to deny relief, preserving the defendant's right to argue the same issue through a petition for post-conviction relief. This [c]ourt will rule on the merits on the rare occasions where (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.

*Wilcher v. State*, 863 So. 2d 776, 825 (¶171) (Miss. 2003) (internal citations and quotation marks omitted). Since neither situation is present here, we decline to address this issue and dismiss Jenkins's ineffective-assistance-of-counsel claim without prejudice, so that he may seek permission from the Mississippi Supreme Court to raise this issue in a post-conviction-relief petition, if he so chooses. Jenkins's conviction is affirmed.

¶27. **AFFIRMED.**

**LEE, C.J., IRVING, P.J., BARNES, CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**