MAXWELL, J.,
 

 for the Court.
 

 ¶ 1. On October 2, 2006, a Harrison County grand jury returned a two-count indictment charging Miguel Angel Solorza-no Bartolo with one count of felony theft of telecommunication services, in violation of Mississippi Code Annotated section 97-25-54(6)(a) (Rev.2006), and one count of murder, in violation of Mississippi Code Annotated section 97-3-19(l)(a) (Rev.2006). The charges stemmed from the killing of an active duty Naval Police Officer in Biloxi, Mississippi. Before trial, Bartolo moved to suppress his statements to law enforcement officers. After hearing testimony about the circumstances surrounding his statements, the court denied the motion to suppress. Bartolo proceeded to trial and was convicted on both counts. He was sentenced to ten years’ imprisonment on the theft of telecommunications services charge and life on the murder count. The sentences were ordered to run concurrently.
 

 ¶ 2. Aggrieved, Bartolo appeals asserting essentially four arguments: (1) the trial court erred in denying his motion to suppress his statements to law enforcement officers; (2) the evidence was sufficient to support an imperfect self-defense manslaughter conviction, but insufficient to support a murder conviction; (3) the trial court erred in admitting telephone records; and (4) insufficient evidence existed to support his conviction for felony theft of telecommunication services.
 

 ¶ 3. We affirm Bartolo’s murder conviction, but we find error and reverse his conviction for felony theft of telecommunication services, and remand with directions
 
 *525
 
 to the circuit court to enter judgment of conviction on the lesser-included offense of misdemeanor theft of telecommunication services, and remand for sentencing on the lesser-included theft offense.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 4. Taking the facts in the light most favorable to the July’s verdicts as we are bound to do, the record shows that on or about February 16, 2006, Christy Ayala (Christy), an active duty Naval Police Officer, attended the grand opening of Club IP, a night club located inside of the Imperial Palace Casino (Imperial Palace) in Biloxi, Mississippi. Christy arrived at Club IP between 11:00 p.m. and midnight and met her friend Sadie Honguyen (Sadie). The two had a few drinks, socialized, and danced with people Sadie knew.
 

 ¶ 5. As the night continued, Sadie noticed that Christy had disappeared. She looked in the restroom and also tried to find Christy in one of the gambling areas. At approximately 2:30 a.m., Sadie reached Christy on her cellular telephone. Christy said she was outside, but the phone was disconnected during the call. When the club closed at 3:30 a.m., Sadie and another woman looked for Christy around the casino but could not find her. A little after 4:00 a.m., Sadie left the casino and traveled home.
 

 ¶ 6. At approximately 7:30 a.m., Officer Brad Smith, with the Biloxi Police Department, was notified that a body was found floating in the back bay behind Imperial Palace. Officer Smith and two other officers secured the scene and waited for investigators. A jacket was found floating on the shoreline near the body. Photographs of the crime scene were taken, and the three officers pulled the body of a dead female out of the water. There was no identification found on the body. The Gulfport Seabee Base contacted the Imperial Palace and reported that a twenty-four-year-old “troop member” named Christy Eileen Ayala was missing. Christy was later positively identified as the woman found floating in the bay.
 

 ¶ 7. Surveillance video documented that Christy and a Hispanic male left Club IP at 2:18 a.m. and were together at several different locations in the casino. Biloxi Police Department Investigator Susan Kimble reviewed Christy’s bank records and noticed two failed ATM withdrawal attempts that took place around 4:00 a.m. that morning. An incorrect pin number was used during the failed withdrawals. Christy’s official United States Navy badge was also found inside an Imperial Palace toilet drain in an area undergoing renovations.
 

 ¶ 8. A review of Christy’s cellular telephone records revealed that her cell phone was still being used. Records indicated that a call was placed from Christy’s phone to a Biloxi school. The school director identified the person who placed the call as Rossana Chavez. Chavez had borrowed the phone from an individual in the Imperial Palace break room. She identified this person as Bartolo, with whom she had been in recent communication.
 

 ¶ 9. On February 27, 2006, Investigator Kimble orchestrated a recorded telephone call from a supervisor at Imperial Palace to Christy’s missing cell phone. The supervisor used a ruse that the casino owed Bartolo some money. Bartolo in turn called Chavez to verify that there was indeed a check waiting on him. Bartolo’s location was then traced to a Houston, Texas apartment, and on February 28, 2006, officers with the Houston Police Department made entry into the apartment with an arrest warrant for Bartolo. Bar-tolo was found on a couch under a blanket holding Christy’s cell phone in his hand.
 
 *526
 
 Bartolo gave the officers a fictitious name. He also told one of the investigators that the cell phone was his, and that he had owned it for over a year. A check of the cell phone’s voice mail feature revealed that it still had Christy’s voice on the greeting. Also, phone records listed Christy as the subscriber of the cell phone.
 

 ¶ 10. On March 1, 2006, Houston Police Department Homicide Investigator Jesus Sosa interviewed Bartolo. The interview was conducted in Spanish and a video recording device was used to capture the interview. Bartolo was advised in Spanish of his
 
 Miranda
 
 rights, which he waived and agreed to be interviewed. According to Investigator Sosa, Bartolo first denied any involvement with Christy, then admitted dancing with her at the club. Investigator Sosa testified that Bartolo next claimed that the two walked outside of the casino and a vehicle struck Christy and left the scene. At that point, Bartolo said he picked up Christy’s cell phone and put her in the water. He then claimed he went inside the casino to eat dinner and later went to bed.
 

 ¶ 11. Investigator Sosa testified that as the interview continued Bartolo admitted that there was a struggle. Bartolo then recounted slightly differing versions of how Christy was choking him because he would not have sex with her. Bartolo claimed that he in turn reacted and choked her around the neck with his hands. Bar-tolo demonstrated on Investigator Sosa the manner in which he choked Christy. According to Investigator Sosa, Bartolo said Christy passed out and fell next to him. Bartolo then admitted he dragged Christy to the water and threw her in the bay. Investigator Sosa also testified that Barto-lo confessed to stealing Christy’s cell phone and wallet and attempting to use her credit card. A partial transcript from the videotaped interview was admitted into evidence.
 

 ¶ 12. Dr. Paul MeGarry, a forensic pathologist, testified that he concluded “there was a violent struggle. That [Christy] had something around her neck to a point where she could not breathe, and then was immersed in water and was able to gasp some water into her lungs before she died.” Dr. MeGarry also testified that the injuries to Christy were “what [he] would expect from a ligature type of strangulation, something pulled against the neck like a piece of fabric or a piece of belt or something of that nature....” In Dr. McGarry’s opinion, Christy was “near death from the injuries and strangulation, but died from a combination of the strangulation and the intake of the water.”
 

 DISCUSSION
 

 I. Motion to Suppress Statements to Law Enforcement Officers
 

 ¶ 13. Bartolo contends he has the equivalency of an elementary education and did not understand his
 
 Miranda
 
 rights when they were read to him in Spanish. He suggests that these alleged limitations rendered his statements to police officers involuntary.
 

 A.
 
 Standard of Review
 

 ¶ 14. When Miranda
 
 [1]
 
 warnings have been given, the test is whether there has been under the totality of the circumstances, a knowing and voluntary waiver by the accused of his privilege against self-incrimination.
 
 Kniep v. State,
 
 525 So.2d 385, 389 (Miss.1988) (citation omitted). The burden falls on the State to prove the
 
 *527
 
 voluntariness of the confession beyond a reasonable doubt.
 
 Carley v. State,
 
 739 So.2d 1046, 1050(¶16) (Miss.Ct.App.1999) (citations omitted). This burden is met by offering the testimony of these individuals having knowledge of the facts that the confession was given without threats or coercion.
 
 Id.
 
 Great deference is afforded to the trial court’s findings because of the judge’s unique opportunity to observe the witnesses and to assess their credibility.
 
 Id.
 
 at (¶ 17). “Once the trial judge has determined at a preliminary hearing, that a confession is admissible, the defendant/appellant has a heavy burden in attempting to reverse that decision on appeal.”
 
 Id.
 
 at (¶ 18) (citation omitted).
 

 B.
 
 BaHolo’s Statements to Laiv Enforcement
 

 ¶ 15. During the suppression hearing, the State offered the testimony of law enforcement officers who interviewed Bar-tolo. Houston Police Department Homicide Investigator Richard Moreno testified that because Bartolo spoke Spanish, Investigator Moreno used a card that contained a Spanish version of the
 
 Miranda
 
 warning.
 
 [2]
 
 Moreno explained that he read each of the five enumerated rights to Bartolo, one by one. At the end of each individual right, Moreno asked Bartolo, in Spanish, if he understood that particular right. After Bartolo acknowledged he understood the specific right, Investigator Moreno would then move to the next one. According to Investigator Moreno, Bartolo maintained that he understood his rights, waived them, and then gave him a statement.
 

 ¶ 16. Investigator Moreno interviewed Bartolo on a second occasion, this time at the Houston Police Department. During this interview, Moreno explained that “on number one ... [Bartolo] didn’t understand what I was telling him.” This first right listed on the card stated, “[y]ou have the right to remain silent and not make any statement at all and that any statement you make may be used against you and probably will be used against you at your trial.” To insure that Bartolo understood this right, Investigator Moreno explained “[t]hat was gone over in a more simpler definition, and, in fact, at some point [Bartolo] was actually giving me his own definition of his interpretation of the rights.... ” Moreno testified that in his opinion the interpretations given by Barto-lo were correct. Once more, Bartolo waived his rights, agreed to be interviewed, and gave a statement to Investigator Moreno. According to Moreno, after Bartolo’s initial question, Bartolo never invoked his right to remain silent, nor did he ask for an attorney. No promises, threats, or coercion were used during the interview.
 

 ¶ 17. The following day, March 1, 2006, Bartolo was interviewed by Investigator Sosa. Investigator Kimble was also present. Investigator Sosa used a similar
 
 Miranda
 
 warning card, and advised Bartolo of his rights in Spanish. Bartolo told Sosa that he did not understand the first right. Investigator Sosa re-read the first right to Bartolo, this time a bit slower, and Bartolo acknowledged that he understood it. Investigator Sosa then read the remaining
 
 Miranda
 
 rights to Bartolo, and Bartolo maintained that he understood them. Bartolo then waived his rights and agreed to be interviewed. During the videotaped interview, Bartolo initially denied the struggle with Christy, but he later confessed to choking her. He also admitted that he dragged her body about “six paces” to
 
 *528
 
 the bay and dumped her in the water. Bartolo also identified Christy through an autopsy photograph as the person he had choked. This interview lasted approximately one hour and fifteen minutes. At no point did Bartolo invoke any of his
 
 Miranda
 
 rights.
 

 ¶ 18. Bartolo called Joshua Abel Coll,
 
 [3]
 
 who was incarcerated at the Harrison County Detention Center, as a witness during the suppression hearing. Coll testified that he helps serve as an interpreter for Spanish-speaking inmates. Coll reviewed a recording of Bartolo’s March 1, 2006, interview and testified that he did not believe Bartolo understood his rights and that he did not agree with Investigator Sosa’s interpretations. However, Coll admitted during cross-examination that he had not even reviewed the transcript of the interview to compare it to the audio portion of the interview. Perhaps most importantly though, Coll also testified that like Investigator Sosa, he too was able to communicate with Bartolo in Spanish.
 

 ¶ 19. In his brief, Bartolo cites a number of cases concerning the exclusion of statements of defendants who were questioned in languages other than their own.
 
 See, e.g., United States v. Garibay,
 
 143 F.3d 534, 538 (9th Cir.1998);
 
 United States v. Guay,
 
 108 F.3d 545, 549 (4th Cir.1997);
 
 United States v. Short,
 
 790 F.2d 464, 469 (6th Cir.1986). However, we find these cases inapplicable because they concern defendants who did not speak English, but were questioned in English. This issue is not before the Court because Bartolo, a Spanish speaker, was questioned in Spanish. And though Bartolo’s attorney argues that he spoke Zapotee, a dialect of Spanish, there was no testimony during the suppression hearing or at trial to support this allegation.
 

 ¶ 20. Even if this were the case, other courts have confronted and rejected similar claims. In
 
 Perri v. Director, Department of Corrections,
 
 817 F.2d 448, 449, 452-53 (7th Cir.1987), the Seventh Circuit Court of Appeals, in addressing a similar claim of inadequate translation, held that a
 
 Miranda
 
 warning administered in an Italian dialect different from the defendant’s dialect, was sufficient to effectuate a valid waiver. Also, in
 
 United States v. Hernandez,
 
 913 F.2d 1506, 1510 (10th Cir.1990), the Tenth Circuit Court of Appeals followed the Eleventh Circuit’s logic that “[although language barriers may inhibit a suspect’s ability to knowingly and intelligently waive his
 
 Miranda
 
 rights, when a defendant is advised of his rights in his native tongue and claims to understand such rights, a valid waiver may be effectuated.” (Citing
 
 United States v. Boon San Chong,
 
 829 F.2d 1572, 1574 (11th Cir. 1987)).
 

 ¶ 21. Here, the trial court heard evidence that Bartolo’s native language was Spanish. As Investigator Sosa put it, “[Bartolo] spoke the common Spanish language I’m accustomed to speaking myself.” Investigator Sosa also pointed out that it did not appear Bartolo had any problems understanding Spanish and that his answers were responsive to Investigator Sosa’s questions. Even Bartolo’s jailhouse interpreter, Coll, who admittedly did not speak the Zapotee dialect, testified that he too was able to communicate with Bartolo in Spanish.
 

 ¶ 22. Bartolo also contends his unfamiliarity with the criminal process favored suppression of his statements. But the trial judge found it interesting, as do we, “that the defendant understood the situation and the questions well enough to ask how many years he was going to get
 
 *529
 
 for this. He seemed to be worried about that.”
 

 ¶ 23. Finally, Bartolo claims his lack of a formal education required the suppression of his statements. Investigator Moreno testified that Bartolo told him he had the equivalency of an elementary education and could not read or write. However, the supreme court has held that “mental weakness in and of itself will not invalidate a confession unless it is shown that the weak[-]minded person has been overreached.”
 
 Stevens v. State,
 
 458 So.2d 726, 729 (Miss.1984) (citing
 
 Williamson v. State,
 
 330 So.2d 272, 276 (Miss.1976)). “In each case, the totality of the circumstances must be considered to determine whether the mentally-deficient defendant has been exploited.”
 
 Id.
 
 (citing
 
 Neal v. State,
 
 451 So.2d 743, 756 (Miss.1984)).
 

 ¶ 24. Here, the record reflects there was no overreaching, and the trial court carefully weighed the testimony of each witness as well as the totality of the circumstances surrounding Bartolo’s waiver of his
 
 Miranda
 
 rights and his subsequent statements to law enforcement and found that the statements were voluntarily given. “Such findings are treated as findings of fact made by a trial judge sitting without a jury as in any other context.”
 
 Hunt v. State,
 
 687 So.2d 1154, 1160 (Miss. 1996) (citation omitted). The supreme court instructs that even when faced with contradictory evidence, we must generally affirm the trial court’s findings in suppression hearings.
 
 Id.
 
 (citation omitted). Of further importance is the fact that neither the video nor the complete transcript of the interview with Investigator Sosa were offered into evidence during trial. Instead, Bartolo and the State arrived at an agreement to enter one page of the transcript of the videotaped interview, which contained a Spanish to English translation. Accordingly, based on the totality of the circumstances including the testimony from the investigators and Bartolo’s own interpreter that Bartolo spoke Spanish, we find that Bartolo fails to show that his
 
 Miranda
 
 waiver was involuntary and likewise fails to meet his heavy burden of persuading us that the trial court erred in denying his motion to suppress. This issue is without merit.
 

 II. Legal Sufficiency of the Evidence to Support Bartolo’s Murder Conviction
 

 ¶ 25. Next, Bartolo attacks the sufficiency of the evidence supporting his murder conviction. He claims the State fell short of proving he acted with deliberate design and that the evidence established, at most, that he was guilty of imperfect self-defense manslaughter.
 

 ¶ 26. In a deliberate-design murder case, the State must prove the following elements. beyond a reasonable doubt: (1) the defendant killed the victim, (2) without authority of law, and (3) with deliberate design to effect her death.
 
 Dilworth v. State,
 
 909 So.2d 731, 736(¶ 18) (Miss.2005). “[D]eliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent.”
 
 Gossett v. State,
 
 660 So.2d 1285, 1293 (Miss.1995) (citation omitted).
 

 ¶ 27. In considering the sufficiency of the evidence to support a criminal conviction, “the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
 
 Moore v. State,
 
 996 So.2d 756, 760(¶12) (Miss.2008) (citations omitted). Further, the court accepts “as true all of the evidence that is favorable to the State, including all reasonable inferences that may be drawn therefrom, and
 
 *530
 
 ... disregards evidence favorable to [the defendant].”
 
 Id.
 
 (quoting
 
 Anderson v. State,
 
 904 So.2d 973, 977(¶8) (Miss.2004)).
 

 ¶ 28. At trial, Bartolo’s counsel argued that Bartolo acted in self-defense and only choked Christy because she was the aggressor. The trial court granted Bartolo an “imperfect self[-]defense instruction,” which directed the jury to reduce the crime of murder to manslaughter if it found Bartolo killed Christy “without malice and under a bonafide belief, but without reasonable cause [and that] it was necessary for him to do so in order to prevent Christy Ayala from inflicting death or great bodily harm upon him.... ” However, the jury rejected this theory.
 

 ¶ 29. Bartolo alternatively argues that because he was the only witness to Christy’s death, the
 
 Weathersby
 
 rule applied, and his version of the events must be accepted, which at most establishes imperfect self-defense manslaughter.
 

 ¶ 80. In 1988, the Mississippi Supreme Court in
 
 Weathersby v. State,
 
 165 Miss. 207, 209, 147 So. 481, 482 (1933), held that where a “defendant or the defendant’s witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the [S]tate, or by the physical facts or by the facts of common knowledge.” (Citations omitted). At trial, Bartolo did not testify, and he called no witnesses in his case-in-chief. Because he rested without offering proof, he failed to put on his version of the homicide. Nevertheless, Bartolo attempts to trigger
 
 Weathersby
 
 by claiming that his version of the events was elicited through the testimony of the two investigators and by the admission of a partial transcript of one of his statements.
 

 ¶ 31. However, no appellate court in Mississippi has ever held that unsworn statements to law enforcement may be used for purposes of a
 
 Weathersby
 
 analysis.
 
 Garrett v. State,
 
 921 So.2d 288, 291(¶ 14) (Miss.2006);
 
 see also Carter v. State,
 
 221 Miss. 111, 113-14, 72 So.2d 231, 232 (1954). Accordingly, because Bartolo did not establish his version of Christy’s death through his own testimony or by offering witnesses at trial, he may not invoke the
 
 Weathersby
 
 rule.
 

 ¶ 32. We also note that additional direct evidence of Bartolo’s deliberate design to murder Christy can be gleaned from the testimony of the pathologist, Dr. McGarry. He testified that he concluded “there was a violent struggle. That [Christy] had something around her neck to a point where she could not breathe, and then was immersed in water and was able to gasp some water into her lungs before she died.” Dr. McGarry testified that the injuries to Christy were “what [he] would expect from a ligature type of strangulation, something pulled against the neck like a piece of fabric or a piece of belt or something of that nature.... ”
 

 ¶ 33. The supreme court has held that deliberate design “connotes an intent to kill and may be inferred through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury.”
 
 Brown v. State,
 
 965 So.2d 1023, 1030(¶ 28) (Miss.2007) (citing
 
 Wilson v. State,
 
 936 So.2d 357, 364(¶ 17) (Miss.2006)). Based on Dr. McGarry’s testimony, it was reasonable for the jury to infer that instead of using his hands, Bartolo used some sort of instrument to strangle Christy. Such evidence also directly contradicts his testimony that he choked her with his hands. For these reasons, we reject Bartolo’s claim that the evidence presented was legally insufficient to support his deliberate-design murder conviction.
 

 
 *531
 
 III. Admission of Christy’s Cell Phone Records
 

 ¶ 34. Bartolo contends that Christy’s cell phone records were improperly admitted at trial because the State did not offer a custodian from Sprint to sponsor the documents. Business records, such as telephone billing information, are typically admitted under what is known as the business-records exception. Mississippi Rules of Evidence 803(6) provides an exception to the hearsay rule for records “made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make” the record.
 

 ¶ 35. At trial, the State sought to admit cell phone records through Investigator Kimble. Bartolo’s attorney objected to their admission, and the following exchange occurred:
 

 Defense Attorney: Judge, the State’s Exhibit number 8 is a faxed copy from Sprint. I think the original—we don’t have an original. It is a copy. And on top of it being a copy, it’s a fax copy, your Honor. So we would object to State’s Exhibit number 8 coming in.
 

 Prosecutor: Your Honor, the best-evidence rule allows that a fax copy is admissible, just as the original.
 

 The Court: All right.
 

 Defense Attorney: Judge, if I can respond to that. The original is the best evidence not a fax copy of a copy, so we would object, still hold our objection to State’s Exhibit number 8.
 

 The Court: Objection is noted and overruled. They will be admitted and marked in evidence.
 

 We review a trial court’s admission or exclusion of evidence for abuse of discretion.
 
 Juarez v. State,
 
 965 So.2d 1061, 1065(¶ 9) (Miss.2007) (citation omitted).
 

 ¶ 36. It is clear from the record that Bartolo’s counsel objected to the admission of the cell phone records because they were copies—not because the documents did not fall within the business-records exception. It is also evident that Bartolo did not contest their admission based on the State’s failure to offer a proper sponsoring record custodian.
 

 ¶ 37. “An objection on one or more specific grounds constitutes a waiver of all other grounds.”
 
 Spicer v. State,
 
 921 So.2d 292, 316(¶ 49) (Miss.2006) (citations omitted). “And a party having specifically objected at trial, cannot present different grounds for the objection on appeal.”
 
 Walden v. State,
 
 29 So.3d 17(¶ 14) (Miss. Ct.App.2008) (citing
 
 Williams v. State,
 
 971 So.2d 581, 589(¶ 27) (Miss.2007)). These later asserted grounds were not before the trial judge for his consideration and, therefore, were not properly preserved for our review and are procedurally barred.
 

 ¶ 38. In addressing Bartolo’s objection on the ground that the cell phone records were merely faxed copies, it is well settled that duplicates or copies of original documents are at times admissible at trial. Mississippi Rule of Evidence 1003 provides that “[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.” Here, Investigator Kimble testified that she received the cell phone records pursuant to a subpoena served on Sprint and that the records were sent directly to her attention at the Biloxi Police Department. While the mere fact that documents were obtained by subpoena does not in and of itself establish their admissibility, Barto-
 
 *532
 
 lo’s attorney neither questioned the authenticity of the phone records nor did she assert why it would be unfair to admit them. Therefore, we see no reason to require the original records in this instance. Accordingly, we find that the trial court did not abuse its discretion in admitting copies of Christy’s cell phone records.
 

 IV. Bartolo’s Conviction for Felony Theft of Telecommunication Services
 

 ¶ 39. Bartolo was also convicted of felony theft of more than $50 in telecommunication services, in violation of Mississippi Code Annotated section 97-25-54(6)(a). Mississippi Code Annotated section 97 — 25—54(6)(a) provides:
 

 A person shall be guilty of theft of telecommunications services if, having control over the disposition of services of others to which he is not entitled, he knowingly diverts such services to his own benefit or to the benefit of another not entitled thereto. Theft of telecommunications services when the value of the services obtained or diverted is less than Fifty Dollars ($50.00) shall be a misdemeanor. Theft of telecommunications services when the value of the services obtained or diverted is Fifty Dollars ($50.00) or more shall be a felony and shall be punished by a fine not to exceed Ten Thousand Dollars ($10,-000.00), or commitment to the custody of the State Department of Corrections for a period not to exceed ten (10) years, or both.
 

 ¶ 40. At trial, Bartolo moved for a directed verdict claiming that the State offered insufficient evidence to prove he unlawfully diverted more than $50 of phone services to his use during this time period charged. He renews this claim on appeal and argues that at most he is guilty of the lesser-included offense of misdemeanor theft of telecommunication services.
 

 ¶ 41. “In analyzing the sufficiency of the evidence, ‘[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’ ”
 
 Moore,
 
 996 So.2d at 760(¶ 12) (quoting
 
 Jones v. State,
 
 904 So.2d 149, 158-54(¶ 12) (Miss.2005)).
 

 ¶42. Here, the State presented the jury with limited cellular telephone records consisting of one billing information sheet obtained from Sprint as well as call logs documenting incoming and outgoing telephone calls from Christy’s cell phone. In viewing these documents in a light most favorable to the State, the subscriber information indicates a base monthly charge of $69.99 from Sprint to Christy and a total amount due of $97.14. Also, the records of incoming and outgoing phone calls show that over sixty telephone calls were made to or from Christy’s phone, after her death, from February 19, 2006, through February 21, 2006.
 

 ¶ 43. We note that the trial judge struggled with the sufficiency of the State’s evidence on this charge. In deciding whether to dismiss this count at the close of the State’s case, he admitted:
 

 I have some problems with Count 1.... The indictment and the statute requires that the use of the telephone service exceed $50 in value, and I have reviewed the bill that came into evidence, and it has a base monthly charge of $60 [sic], $59.99 [sic] and a total charge of $97, I think. And I don’t think that it has been shown or proven that $50 of that $94 was the result of the usage of the phone by the defendant.
 

 Even though he had concerns, the trial judge denied the defendant’s motion for a directed verdict and allowed the felony charge to go to the jury.
 

 
 *533
 
 ¶ 44. Mississippi appellate courts have not previously addressed section 97-25-54(6). Therefore, we start with a review of the statute. To sustain a conviction for the felony portion of section 97-25-54(6), the State must offer sufficient evidence to prove beyond a reasonable doubt that: (1) the defendant had control over the disposition of services of another, to which he was not entitled; (2) he knowingly diverted such services to his own benefit or to the benefit of another not entitled thereto; and (3) the value of the services obtained or diverted was at least $50.
 

 ¶ 45. Here, the only element at issue is the third element — the value of the services obtained or diverted. In criminalizing the theft or diversion of “telecommunication services,” this section makes it a felony
 
 “when the value of the services obtained or
 
 diverted”
 
 is more than $50.00.
 
 Miss.Code Ann. § 97-25-54(6)(a) (emphasis added). Section 97-25-54(l)(b) (Rev. 2006) defines “[telecommunication service” as “any service provided for a charge or compensation to facilitate the origination ... or reception of ... signals ... of any nature by telephone, including cellular telephones[.]” In determining the value of the services at issue, we fully appreciate the benefit to Bartolo of having access to a cellular telephone while on the run. However, section 97-25-54(6)(a) looks to the value of the “services obtained or diverted,” not the subjective benefit received by the offender. Here, the State was required to prove that the value of Sprint’s services obtained or diverted by Bartolo was in excess of $50. We find that they failed to do so.
 

 ¶ 46. The State did not call any telephone company representatives to establish the value of the stolen services, and the records alone offer little help to support the State’s argument. The one page of subscriber information did not provide any indication of the beginning or ending date of the billing cycle. Also, while there are a number of calls that Bartolo made from the phone, the State offered no evidence to establish that Christy’s plan with Sprint charged her a specific rate per call that could be aggregated to reach the $50 threshold. The State attempted to elicit testimony from a police investigator that after the minutes of the base plan were exhausted, subsequent calls not covered by the plan might add up to the $50 statutory minimum. But when asked how many additional calls were made outside of the base plan, the investigator admitted, “I’m not sure.” Alternatively, the State argues that if Bartolo used the cell phone on just one day of the next billing cycle, he should be held accountable for the entire $69.99 monthly charge. However, the records alone do not define the dates of the billing cycle. The investigator did testify that she believed the ending period for the billing cycle was February 20, 2006, but the document itself did not support her testimony. While evidence may have existed to support the enhanced charge, the State failed to offer it at trial.
 

 ¶ 47. There is sufficient evidence, however, to support a conviction for the lesser-included offense of theft of less than $50 in telecommunications services. This Court has the authority to affirm a conviction for the lesser-included offense, while at the same time reversing the greater offense if such a result is warranted.
 
 Craig v. State,
 
 520 So.2d 487, 493 (Miss. 1988);
 
 Drane v. State,
 
 493 So.2d 294, 300 (Miss.1986);
 
 Neal v. State,
 
 936 So.2d 463, 470(22) (Miss.Ct.App.2006). Accordingly, Bartolo’s judgment of conviction of felony theft of telecommunication services is reversed. We hereby remand with directions to the circuit court to enter judgment on the lesser-included offense of theft of less than $50 of telecommunication
 
 *534
 
 services, and we remand this case to the trial court to sentence Bartolo on this lesser-included offense.
 

 ¶ 48. THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF COUNT II, MURDER, AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED; AND THE JUDGMENT OF CONVICTION OF COUNT I, FELONY THEFT OF TELECOMMUNICATIONS SERVICES, AND SENTENCE OF TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS REVERSED AND REMANDED FOR ENTRY OF JUDGMENT ON THE LESSER-INCLUDED OFFENSE OF MISDEMEANOR THEFT OF TELECOMMUNICATIONS SERVICES AND FOR SENTENCING. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
 

 [1]
 

 . A suspect who has been advised of his rights against self-incrimination "may waive effectu-ation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently.”
 
 Miranda v. Arizona,
 
 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [2]
 

 . Investigator Moreno testified that he was certified by the City of Houston as a "Spanish speaker.”
 

 [3]
 

 . Coll admitted during testimony that he is a ten time convicted felon.