# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00661-COA

**CAMERON HENDERSON A/K/A CAMERON ADAM HENDERSON**  APPELLANT

**v.**

**STATE OF MISSISSIPPI**  APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/06/2022 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS JR. |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA LEBRON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/12/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WESTBROOKS, P.J., GREENLEE AND McDONALD, JJ.**

**WESTBROOKS, P.J., FOR THE COURT:**

¶1.     Dale O'Neal was murdered in his prison cell in the Clay County jail on March 15, 2019. His cellmate, Cameron Henderson, was indicted for first-degree murder pursuant to Mississippi Code Annotated section 97-3-19(1)(a) (Supp. 2017). A Clay County Circuit Court jury found Henderson guilty. He was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. The trial court denied Henderson's motion for judgment notwithstanding the verdict or a new trial. Aggrieved, Henderson appeals his conviction, arguing that (1) the evidence was insufficient for a first-degree murder conviction, and (2) the jury's verdict was contrary to the weight of the evidence. Finding no

error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Dale O'Neal was booked into the Clay County jail on March 8, 2019, on a bench warrant and trespassing charge. He was assigned to Cell N-2 in the north zone, where misdemeanor offenders are housed. Days later, O'Neal went to court and was set to be released on March 15, 2019. Mark Gann, an inmate who was also in court with O'Neal, testified that "[O'Neal] was in a good mood" before and after court because he was finally going to be released.

¶3. On March 13, 2019, Cameron Henderson was booked in the Clay County jail for disturbing the peace and misdemeanor shoplifting. He was also assigned to Cell N-2 in the north zone. O'Neal was his only cellmate.

¶4. Each cell in the north zone was equipped with a pay phone attached to the wall. According to testimony at trial, inmates are afforded one collect call. After that, they must set up a personal identification number (PIN) and have money transferred to their books to make phone calls. It is unclear if Henderson ever received his free call. Ethan O'Brian, an inmate housed in the north zone at that time, testified that Henderson was "frantic and upset that the [correctional officers] wouldn't let him use the phone" on March 14, 2019. O'Brian said that Henderson yelled and beat on his cell door to get the attention of the guards throughout the day, and he did not calm down until around dinnertime.

¶5. Henderson's behavior disturbed several inmates in the north zone. O'Brian said that

2

he had to tell Henderson to calm down because he and his cellmates were trying to watch TV. Inmates in Cell N-9 told Henderson to "shut the 'F' up." An altercation even ensued between Henderson and Mario Gill, an inmate in Cell N-1. Nevertheless, several inmates testified that they never heard any arguments nor saw an altercation specifically between Henderson and O'Neal. Also, all the Clay County jail officers who testified said they never received any complaints or grievances regarding issues between O'Neal and Henderson.

¶6. On March 15, 2019, inmates were served breakfast around 4:00 a.m. When asked about O'Neal's demeanor that morning, Gann testified that O'Neal was "[h]appy . . . he was fixing to get out of jail." A few hours after breakfast, Henderson lightly knocked on Henderson's cell door and stated in a "normal" tone that his cellmate had hung himself. Alarmed, the other inmates in the north zone began kicking and beating against their cell doors and yelling "man down, man down" to get the guards' attention.

¶7. Officer Gail Miles was one of the officers on duty that morning. When she heard the commotion coming from the north zone, she quickly alerted two trustees, Rafeal Hamilton and Frank Weatherspoon, to assist her. Hamilton testified that when Officer Gail unlocked Cell N-2, Henderson rushed out, nearly running over Officer Gail. Inside the cell, they observed O'Neal's body "slumped over on the floor with the telephone cord wrapped around his neck." O'Neal was unresponsive, so Hamilton and Weatherspoon lifted his body, unwrapped the cord from around his neck, and laid him down on the floor in the hallway. Officer Gail then called for medical assistance and placed Henderson in a processing cell by

himself. She also alerted her chain of command, which included Sergeant Anthony Cummings, Captain Jeremy Bell, and Major Steven Young. After the paramedics arrived, they assessed O'Neal's injuries and contacted the coroner.

¶8. Mississippi Bureau of Investigation (MBI) was assigned to investigate the case, and MBI Agent Vernon Hathcock served as the lead investigator. Officers from the Clay County jail took the initial steps in the investigation and remained available to assist MBI. Captain Bell secured the scene and took pictures of the north zone, the inside of Cell N-2, O'Neal's body, and close-up pictures of the injuries to O'Neal's neck. Sergeant Cummings interviewed some of the inmates who were in the north zone when the incident occurred. He also reviewed the surveillance footage and turned it over to Agent Hathcock. Major Young worked more directly with MBI throughout the investigation. He retrieved a boiled egg from O'Neal's sock and a sausage, biscuit, and Bible from O'Neal's pocket. He also assisted Agent Hathcock with interviewing and taking pictures of Henderson.

¶9. In his initial statement on the day in question, Henderson said that O'Neal had hung himself. However, in a subsequent interview conducted the next day, Henderson recounted a different version of what led to O'Neal's death. Agent Hathcock and Major Young read Henderson his *Miranda* rights,[1] which he waived, and they videotaped his new statement. During this interview, Henderson alleged that while he was asleep on his rack, O'Neal began pulling at his feet. Then he claimed that O'Neal either attempted to (or did) bite him.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

4

Henderson said that he jumped off of his rack and tried to calm him down, but then O'Neal tried to put the phone cord around Henderson's neck. Henderson claimed he reversed the situation and put the phone cord around O'Neal's neck, strangled him until he stopped moving, and then got back in his rack and went to sleep. Major Young testified that during the second interview, Henderson's demeanor was "calm, matter of fact." He also revealed that Henderson never mentioned O'Neal possessing a weapon or threatening to kill him before the altercation.

¶10. In an effort to corroborate an alleged physical altercation between Henderson and O'Neal, Agent Hathcock and Major Young took pictures of Henderson and examined his body for any marks, scratches, or bruises. Major Young claimed that "generally the day after . . . bruises are more—they stand out more than they would from initially after an altercation." The pictures revealed no marks, scratches, or bruises on Henderson's face, neck, arms, or hands that would indicate a physical altercation. Only some redness and bruising appeared on the back of Henderson's hands. Major Young testified that after examining Henderson and reviewing the photos, he did not find any evidence consistent with someone who was fighting for his life. He also said that in his experience as an investigator, it is very common for "suspects to change their story once they've spoken with investigators and they hear . . . some of the evidence . . . and then they tend to make their story fit with the evidence."

¶11. O'Neal's body was sent to the Mississippi State Medical Examiner's Office. Dr.

5

David Arboe performed the autopsy to determine O'Neal's cause of death and prepared a report detailing his findings. At trial, Dr. Arboe testified about the process he undertook to examine O'Neal's body. He explained the key indicators that differentiate strangulation autopsies from hanging autopsies. Then he revealed that O'Neal's head and neck injuries were consistent with strangulation. Dr. Arboe also testified that he received a statement from the coroner, a "re-enactment" of how the body was found, and several pictures that were taken of O'Neal and the telephone cord that was used to strangle him. This evidence further confirmed that O'Neal's death was caused by strangulation.

¶12. In addition to the jail officers and the medical examiner, the State also called several inmates who were housed in the north zone on the day in question. All of them had positive recollections about O'Neal: Rafael Hamilton described O'Neal as a "happy-go-lucky guy. . . . [H]e ain't bring no harm to nobody and nobody never"; Ethan O'Brian said that O'Neal was "polite" and "stayed to himself"; Justin McNutt said that O'Neal was "humble" and an "all-around good guy." Captain Bell said that O'Neal was a "good guy. He was quiet. He really didn't bother anybody."

¶13. At the conclusion of the State's case-in-chief, Henderson moved for a directed verdict. The court denied this motion and advised Henderson of his right to testify; however, Henderson chose not to do so. During jury instructions, Henderson did not seek a lesser-included-offense jury instruction after being advised by the court. The Clay County Circuit Court jury ultimately found Henderson guilty of first-degree murder, and he was sentenced

6

to life imprisonment in the custody of the Mississippi Department of Corrections. On June 3, 2022, Henderson filed a motion for judgment notwithstanding the verdict or a new trial. The court denied that motion on June 17, 2022. Henderson then filed his notice of appeal on June 23, 2022.

## STANDARD OF REVIEW

¶14. Rulings on the sufficiency of the evidence are reviewed de novo. *Turner v. State*, 291 So. 3d 376, 383 (¶20) (Miss. Ct. App. 2020). In considering whether the evidence is legally sufficient to sustain a conviction, "we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Johnson v. State*, 310 So. 3d 328, 331 (¶13) (Miss. Ct. App. 2021). "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements; rather, we must decide whether a reasonable juror could rationally say that the State did." *Id.*; *accord Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017).

¶15. Challenges to the rulings on weight of the evidence are reviewed for abuse of discretion. *Bowman v. State*, 360 So. 3d 977, 996 (¶69) (Miss. Ct. App. 2022). When reviewing a challenge to the weight of the evidence, "[o]ur role as [an] appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable justice." *Eaton v. State*, 359 So. 3d 1081, 1086-87 (¶22) (Miss. 2023) (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017)). "A new trial based

7

on the weight of the evidence should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *Alvarado v. State*, 343 So. 3d 391, 399 (¶26) (Miss. Ct. App. 2022) (quoting *Clark v. State*, 237 So. 3d 844, 847 (¶13) (Miss. Ct. App. 2017)).

## DISCUSSION

### I. Sufficiency of the Evidence

#### A. The *Weathersby* Rule

¶16. Henderson asserts that he was entitled to a directed verdict pursuant to the "*Weathersby* rule." However, after a review of the record, we find that this case does not meet the requirements for the rule to apply. "The *Weathersby* rule essentially is a specific kind of challenge to the sufficiency of the evidence." *Figueroa v. State*, 337 So. 3d 1104, 1113 (¶30) (Miss. Ct. App. 2021) (citing *Green v. State*, 614 So. 2d 926, 932 (Miss. 1992)). The rule holds:

> [W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

*Weathersby v. State*, 165 Miss. 207, 147 So. 481, 482 (1933). "If the *Weathersby* rule applies and the defendant's version affords an absolute legal defense, the defendant is entitled to a directed verdict of acquittal." *Parvin v. State*, 113 So. 3d 1243, 1252 (¶32) (Miss. 2013) (quoting *Green v. State*, 631 So. 2d 167, 174 (Miss. 1994)). However, there are limitations

to the *Weathersby* rule, and our Supreme Court has recognized that "it is a rare case that meets all of the requirements of the *Weathersby* rule." *McQuarters v. State*, 45 So. 3d 643, 650 (¶21) (Miss. 2010) (quoting *Sartain v. State*, 311 So. 2d 343, 345 (Miss. 1975)). "One limitation on the *Weathersby* rule is that it does not apply when the defendant gives inconsistent accounts of the killing *prior to* and at trial." *Figueroa v. State*, 337 So. 3d 1104, 1113 (¶31) (Miss. Ct. App. 2021) (emphasis added) (citing *Parvin*, 113 So. 3d at 1252 (¶34)).

¶17. Here, Henderson gave inconsistent accounts of the murder to the investigators. Initially, Henderson told the investigators that O'Neal had hung himself with the telephone cord. However, the next day, Henderson completely changed his story. In his second interview, Henderson alleged that O'Neal had attacked him and that it was a "life-or-death situation," so he strangled O'Neal with the telephone cord in self-defense. These inconsistent versions given before trial preclude Henderson from invoking the *Weathersby* rule.

¶18. Additionally, "*Weathersby* does not automatically apply when the defendant is the only eyewitness. Rather, the Court has held that *Weathersby* has no application where the defendant's version is patently unreasonable, or contradicted by physical facts." *Owens v. State*, 269 So. 3d 1280, 1287 (¶23) (Miss. Ct. App. 2018) (internal quotation mark omitted) (citing *Jones v. State*, 154 So. 3d 872, 878 (¶17) (Miss. 2014)). Both of Henderson's versions of O'Neal's death were substantially contradicted by the medical examiner's testimony, photographs of Henderson's body, and a diagram of the cell. The medical

9

examiner provided detailed testimony about his examination of O'Neal's injuries and his conclusions on how his cause of death was consistent with ligature strangulation as opposed to hanging. After Henderson dropped the hanging theory, he admitted to investigators that he strangled O'Neal with the telephone cord because O'Neal had attacked him. However, there was also evidence to disprove this account. The investigators took pictures of Henderson the day of and the day after the incident. No marks, scratches, or bruises were on Henderson's face, neck, arms, or hands. It is quite difficult to believe that Henderson did not have any injuries on him, yet he claimed that he was in a "life or death situation" and had to fight for his life. Only bruising was found on his hands, which was consistent with him strangling O'Neal to death. The diagram of the cell also revealed a discrepancy in Henderson's altercation story. Henderson told the investigators that O'Neal was able to reach the phone from where they were standing near Henderson's bed. However, the diagram showed that the distance between the mounted telephone and the bed was "86 inches or approximately 7 foot, 2 inches." The telephone was nowhere near the bed, and O'Neal's arm could not stretch eighty-three inches from the bed to the phone. Additionally, several inmates testified that O'Neal was a "polite," "humble," "happy-go-lucky guy" who did not bother anyone and did not have any issues with other inmates.

¶19.   Furthermore, Henderson never offered witnesses nor testified to sufficiently establish his version of the events. Instead, he relies on his unsworn statements to law enforcement that he made during his second interview. "However, no appellate court in Mississippi has

ever held that unsworn statements to law enforcement may be used for purposes of a *Weathersby* analysis." *Bartolo v. State*, 32 So. 3d 522, 530 (¶31) (Miss. Ct. App. 2009). For all of these reasons, the *Weathersby* rule is inapplicable in this case.

### B.    Sufficient Evidence Presented

¶20.    Even without the *Weathersby* rule, Henderson's argument still fails because sufficient evidence was presented at trial for a rational juror to find Henderson guilty of first-degree murder beyond a reasonable doubt.

¶21.    Mississippi Code Annotated section 97-3-19(1)(a) defines first-degree murder as the "killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed." Accordingly, to convict Henderson of first-degree murder, the prosecution had to prove that Henderson (1) killed O'Neal (2) without authority of law (3) but with the deliberate design to effect his death. Miss. Code Ann. § 97-3-19(1)(a). It is undisputed that Henderson strangled O'Neal; therefore, we will address the remaining two elements.

¶22.    Regarding the second element, Henderson argues that the State failed to prove that he did not act in self-defense. "However, this Court has held the issue of justifiable self-defense presents a question of the weight and credibility of the evidence rather than sufficiency and is to be decided by the jury." *Eaton v. State*, 359 So. 3d 1081, 1086 (¶22) (Miss. 2023) (internal quotation marks omitted) (quoting *Newell v. State*, 175 So. 3d 1260, 1268 (¶6) (Miss. 2015)). Accordingly, we will address this issue below concerning the weight of the

evidence.

¶23.    Regarding the third element, Henderson argues that since the State failed to prove deliberate design, the appropriate conviction should have been manslaughter.  "Deliberate design connotes an intent to kill."  *Holliman v. State*, 178 So. 3d 689, 698 (¶19) (Miss. 2015).  Our Supreme Court "has held that 'unless one expresses his intent, the only method by which intent may be prove[d] is by showing the acts of the person involved at the time, and by showing the circumstances surrounding the incident.'"  *Id.* (quoting *Morris v. State*, 748 So. 2d 143, 147 (¶17) (Miss. 1999)).  Additionally, our Court has held:

> The essence of the required intent is that the accused must have had some appreciable time for reflection and consideration before committing the fatal act.  Deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent.  Furthermore, deliberate design may be inferred through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury.

*Ashmore v. State*, 302 So. 3d 707, 714 (¶20) (Miss. Ct. App. 2020) (quoting *Parvin v. State*, 212 So. 3d 863, 868 (¶7) (Miss. Ct. App. 2016)).

¶24.    Here, Henderson used a telephone cord to strangle O'Neal and held it there until he stopped breathing.  The evidence presented showed that Henderson had both a weight and age advantage over O'Neal.[2]  Even if Henderson did not originally intend to kill O'Neal, it was reasonable for the jury to conclude that during the time he overpowered O'Neal and

---

[2] Henderson was twenty years old and weighed 160 pounds, while O'Neal was fifty-four years old and weighed 150 pounds.

strangled him to death, he formed the requisite intent to kill O'Neal. *See Alvarado v. State*, 343 So. 3d 391, 397 (¶18) (Miss. Ct. App. 2022). After all, "[d]eliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent." *Ashmore*, 302 So. 3d at 714 (¶20). Intent can also be inferred from the fact that Henderson did not try to call out for help when he saw that O'Neal was no longer moving. Instead, he left O'Neal's body with the telephone cord around his neck, got back in his rack, and went to sleep.

¶25. Additionally, Henderson's multiple statements to investigators regarding O'Neal's death presented conflicting evidence to the jury. "This conflicting evidence was for the jury's consideration and determination on the question of Henderson's intent." *Christian v. State*, 207 So. 3d 1207, 1218 (¶50) (Miss. 2016). It is not our role to make an independent resolution; rather, it was solely up to the jury to resolve this conflict and determine if Henderson intended to kill O'Neal. Considering the multiple versions of the incident, coupled with all the evidence the State presented, a reasonable jury could rationally conclude that Henderson killed O'Neal with the deliberate design to effect O'Neal's death.

¶26. Accepting all the evidence in a light most favorable to the State, we find that a rational juror could have found that the State proved beyond a reasonable doubt that Henderson killed O'Neal with deliberate design.

## II. Weight of the Evidence

¶27. Henderson also asserts that the trial court erred by denying his alternative motion for

a new trial because his conviction was contrary to the weight of the evidence. We disagree.

¶28.    "It is well established that the jury determines matters of weight, credibility, and conflicting evidence." *Beasley v. State*, 362 So. 3d 112, 126 (¶50) (Miss. Ct. App. 2023) (citing *McCool v. State*, 328 So. 3d 173, 184-85 (¶47) (Miss. Ct. App. 2021)). "[W]e do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Little*, 233 So. 3d at 289 (¶1). As previously noted, self-defense is a question of weight and credibility for the jury to decide. *Eaton*, 359 So. 3d at 1089 (¶22). "A successful self-defense argument requires that the jury believe it was objectively reasonable for the [defendant] to believe he was in danger of imminent death or serious bodily harm." *Id*.

¶29.    Henderson's defense failed likely because he did not provide any evidence that O'Neal threatened his life or possessed a weapon. The only items recovered from O'Neal were a Bible, a sausage, a biscuit, and a hard-boiled egg. Henderson claimed that an altercation between them resulted in a "life or death situation," but no injuries were found on Henderson's body to suggest that he was fighting for his life. In fact, no evidence showed that an altercation between Henderson and O'Neal had ever even occurred. All the Clay County jail officers who testified said they never received any complaints regarding issues between Henderson and O'Neal. Sergeant Cummings testified that when issues exist between inmates, they can notify correctional officers and fill out a grievance form, which could lead to inmates being moved to a different cell. Sergeant Cummings said he never

14

received a grievance form from Henderson. Additionally, the inmates who were housed in the north zone testified that they did not hear nor see an altercation between Henderson and O'Neal at any point before Henderson killed O'Neal. Most of them said that O'Neal never had a problem with any inmates and stayed to himself.

¶30. It was ultimately up to the jury to either believe Henderson's account of the incident or the abundant evidence and ten witnesses presented by the State. Henderson chose not to testify or call any witnesses to substantiate his account of O'Neal's death. The jury simply did not find Henderson's self-defense story credible. He gave inconsistent accounts, and the State provided ample evidence that refuted both of his accounts. Here, we cannot say that the jury's verdict was so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction a unconscionable injustice. We find that the trial court did not abuse its discretion by denying Henderson's alternative motion for a new trial.

**CONCLUSION**

¶31. Based on our review of the record, Henderson's challenges to his conviction are not persuasive. The evidence presented by the State was sufficient to prove to a rational juror all three elements of first-degree murder were met beyond a reasonable doubt. Also, the jury's verdict was not contrary to the overwhelming weight of the evidence. The trial court properly denied Henderson's motion for judgment notwithstanding the verdict and his alternative motion for a new trial. Accordingly, we affirm the trial court's judgment of conviction and sentencing.

15

¶32.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**